UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CANADIAN NATIONAL )
RAILWAY COMPANY AND )
WATERLOO RAILWAY COMPANY, )
                                      )
        Plaintiffs, )
                                      )
    v. )     CV-10-452-B-W
                                      )
MONTREAL, MAINE & ATLANTIC )
RAILWAY, INC. )
                                      )
        Defendant. )

## ORDER ON MOTION TO REMAND

Applying *Fayard v. Northeast Vehicle Services, LLC*,[1] and *Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co.*,[2] the Court preliminarily concludes that it has jurisdiction over Canadian National Railway Company's (Canadian National) complaint against Montreal, Maine & Atlantic Railway, LTD., (MMA) and declines to remand the case to state court.

**I. STATEMENT OF FACTS**

    **A.    The Parties and the Intervenor**

Canadian National, a Canadian corporation with offices in Montreal, Canada, owns and operates a transcontinental railroad system, providing service from coast to

---

[1] 533 F.3d 42 (1st Cir. 2008).
[2] 215 F.3d 195 (1st Cir. 2000).

coast in Canada, and north to south in Canada and the United States.[3] *Compl.* ¶ 1 Attach. 1 (Docket # 1). MMA, a Delaware corporation with offices in Hermon, Maine, owns and operates a railroad system consisting of approximately 745 miles of track in Maine, New Hampshire, Vermont, New Brunswick, and Quebec. *Id.* ¶ 3. Twin Rivers owns and operates a paper mill in Madawaska, Maine and has been a customer of both Canadian National and MMA. *Notice of Removal* Attach. 9, *Mem. of Law in Support of Mot. to Intervene* at 2; Attach. 8, *Aff. of Brian Sass* ¶ 10-11 (Docket # 1).

B.  **Canadian National's Complaint**

On October 29, 2010, Canadian National filed a complaint in Aroostook County Superior Court for the state of Maine against MMA, alleging that MMA is breaching a recorded easement over its tracks that allowed Canadian National to serve Twin Rivers. *Compl.* ¶ 9, 10. Canadian National says that in 2001, Bangor & Aroostook Railroad Company (BAR) owned and operated the same railroad lines now owned and operated by MMA. *Id.* ¶ 11. In 2001, when BAR was experiencing financial distress, it negotiated an easement with Canadian National over certain BAR tracks (Subject Trackage) for $5,000,000, and the recorded easement allows Canadian National to use BAR lines "for the uses and purposes defined and described in that certain Trackage Rights Agreement dated March 14, 2001 between [BAR] and [Canadian National]." *Id.* ¶ 12-14. Canadian National claims

---

[3] Waterloo Railway Company is a Delaware corporation and a wholly subsidiary of Canadian National. *Compl.* at 2. Although Waterloo is a co-plaintiff, its separate status as a subsidiary is not an issue for purposes of the pending motions and in referring to Canadian National, the Court refers to both Canadian National and Waterloo.

2

that the Easement grants it the right to use the Subject Trackage to operate freight trains "for the receipt and delivery of local traffic from and to" the paper mill in Madawaska. *Id.* ¶ 16. In addition to the easement and Trackage Rights Agreement (TRA), BAR and Canadian National entered a Junction Settlement Agreement (JSA) under which BAR agreed to provide at negotiated prices, haulage services for Canadian National over the Subject Trackage, and Canadian National agreed to pay the agreed upon prices for BAR's haulage services. *Id.* ¶ 17. In 2003, MMA purchased from BAR substantially all its operating assets, including the Subject Trackage. *Id.* ¶ 11. The JSA expired on October 31, 2010. *Id.* ¶ 18.

In anticipation of the expiration of the JSA, Canadian National informed MMA in June 2010 that Canadian National intended to commence service to Twin Rivers Mill for its own account and using its own locomotives, freight cars, equipment, and crews and sought assurances from MMA that it would not interfere with Canadian National's exercise of its easement rights. *Id.* ¶ 22. MMA not only failed to provide assurances, but also informed Canadian National that, in MMA's view, Canadian National had "no right whatsoever to perform transportation services within [or adjacent to] the Twin Rivers mill . . . ." *Id.* 23.

Canadian National contends that it instituted this lawsuit to enforce its rights under the terms of the recorded easement.

C.  **MMA's Response**

MMA presents a different view. As background, MMA says that it owns and operates the only set of railroad tracks that run next to and physically connected to the Twin Rivers mill and it owns virtually all of the tracks on the Twin Rivers mill

3

property, including the witching and sorting yard adjacent to the mill. *Prelim. Opp'n to Canadian National Railway's Mot. to Remand* at 2-3 (Docket # 18) (*Def.'s Opp'n*). As a consequence, MMA "has long been the only rail carrier with the ability to directly reach and serve the Twin Rivers facility." *Id.* at 2.

MMA says that Twin Rivers has long had two options for routing its rail traffic. *Id.* at 3. One route (the MMA route) is initially westward and involves MMA track; the other (the CN route) is initially eastward and at first involves MMA track but becomes Canadian National track at the international bridge at St. Leonard, New Brunswick. *Id.* Twin Rivers used both routes for years. *Id.*

Before 2001, MMA originated the shipment from the Twin Rivers mill to St. Leonard and interchanged or handed over the traffic to Canadian National at St. Leonard. *Id.* Because MMA originated the shipment, it billed Twin Rivers for the entire amount of the outbound shipments and remitted Canadian National's share to it. *Id.* In 2001, BAR ceded "trackage rights" to Canadian National over the Van Buren line. *Id.* at 4. In addition, Canadian National entered into a JSA with BAR in which BAR agreed to provide haulage service for Canadian National's account between the Canadian National/BAR interchange in St. Leonard and Twin Rivers mill. *Id.* Attach. 3 at 4, Junction Settlement Agreement (JSA). Instead of BAR billing Twin Rivers, Canadian National took over that responsibility, subject to reimbursement to BAR, and Canadian National became responsible "for establishing rates, contracts, routes, and divisions." JSA at 3. In effect, Canadian

4

National became "the exclusive direct commercial relationship with Twin River[s]." *Def.'s Opp'n* at 4.

Once the easement, the TRA, and JSA were in place, Canadian National filed a Notice of Exemption with the Surface Transportation Board (STB) under 49 C.F.R. § 1150.41 to obtain STB authorization to exercise the rights under the easement, and a Notice of Exemption with the STB under 49 C.F.R. § 1180 to obtain STB authorization to implement the TRA. *Id.* at 5. By doing so, Canadian National acquired the rights and responsibilities of a so-called "common carrier" on the portion of the Van Buren subdivision described in the easement and TRA. *Id.*

Until June 2010, Canadian National did not attempt to use its trackage rights over the Van Buren line. *Id.* However, in June 2010, Canadian National informed MMA that it wished to exercise trackage rights to the Twin Rivers mill, and asked to qualify its crews to operate over MMA track as required by the TRA and standard operating procedure. *Id.* MMA responded that the TRA did not permit Canadian National to reach all the way into the Twin Rivers mill, but only to a point about 2 miles to the east of the mill. *Id.* Although Canadian National would be allowed to operate on MMA's Van Buren line, when the trains reached the point where MMA had exclusive rights, MMA would require its crews to handle the short-haul to the mill and switching services at the mill. *Id.* The parties attempted to reach an accommodation and were unable to do so, resulting in this law suit. *Id.* at 5-6.

D.   **Removal to Federal Court**

5

On November 1, 2010, MMA removed this case to this Court, claiming federal subject matter jurisdiction under 28 U.S.C. § 1441(a). *Notice of Removal* at 1. On November 2, 2010, the Court held a telephone conference to discuss the Plaintiffs' not-yet-filed Motion to Remand; the Court ordered preliminary briefing by Friday, November 5, 2010, and scheduled a follow-up telephone conference for the next Monday.[4] On November 3, 2011, the Plaintiffs moved to remand the case to the Maine Superior Court, Aroostook County, Maine. *Pl.'s Mot. for Remand* at 1 (Docket # 12) (*Pl.'s Mot.*). On November 5, 2010, Twin Rivers filed a memorandum in support of the Plaintiffs' Motion and MMA replied to the Plaintiffs' Motion, *Mem. of Law in Supp. of Pl.s' Mot. for Remand*, (Docket # 17); *Def.'s Opp'n*. The Plaintiffs replied to the Defendants' Response on November 7, 2010. *Pl.s' Reply to Def.'s Opp'n to Mot. for Remand* (Docket # 22) (*Pl,s' Reply*).

## II. DISCUSSION

### A. Principles of Federal Jurisdiction

As courts of limited subject matter jurisdiction, federal district courts may only hear cases where jurisdiction is properly conferred. *See Christopher v. Stanley-Bostitch, Inc.*, 240 F.3d 95, 100 (1st Cir. 2001). Here, MMA asserts federal jurisdiction under 28 U.S.C. § 1441(b), providing in relevant part that:

> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties.

---

[4] Also discussed was the Plaintiffs' pending Emergency Motion for a Temporary Restraining Order and Related Relief and for Entry of Preliminary Injunction Pursuant to Rule 65 (Docket # 4). The Plaintiff asked that the Court defer action on the emergency motion until it resolved the jurisdictional issue.

6

MMA asserts that federal jurisdiction is proper under a right arising under the laws of the United States: the ICC Termination Act of 1995, (ICCTA), 49 U.S.C. §§ 10101, *et seq*. The burden lies with MMA to demonstrate that removal was proper. *Fayard*, 533 F.3d at 48.

As Canadian National casts its causes of action firmly in state law terms, removal to a federal court is proper in "only two circumstances—when Congress expressly so provides . . . or when a federal statute wholly displaces the state-law cause of action through complete pre-emption." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003). Both sides acknowledge that only the latter circumstance—complete preemption—provides any basis for removal here. *Pl's Mot.* at 5; *Def.'s Opp'n* at 8.

Under the doctrine of complete preemption, "[w]hen the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Beneficial Nat. Bank*, 539 U.S. at 8. Thus, "a plaintiff's state cause of action may be recast as a federal claim for relief, making its removal by the defendant proper on the basis of federal question jurisdiction." *Vaden v. Discover Bank*, 129 S. Ct. 1262, 1273 (2009) (internal brackets and quotation marks omitted). Complete preemption exists where "Congress so strongly intended an exclusive federal cause of action that what a plaintiff calls a state law claim is to be *recharacterized* as a federal claim." *Fayard*, 533 F.3d at 45 (1st Cir. 2008). However, "the federal claim need not be co-extensive with the ousted state claim.

7

On the contrary, the superseding federal scheme may be more limited or different in its scope and still completely preempt." *Id*. "The critical question is whether federal law provides an exclusive substitute federal cause of action that a federal court (or possibly a federal agency) can employ for the kind of claim or wrong at issue." *Id*. at 47. The *Fayard* Court explained that "[t]his means - - an example would be some state-law claims relating to pension plans - - that the coverage that would have been supplied by the state claim is not available under the federal ERISA scheme and so simply disappears." *Id*. at 46.

Fortuitously, in *Fayard*, the First Circuit addressed a claim that the ICCTA completely preempted a state law claim and therefore, the Court follows the appellate court's analytic path. The First Circuit noted that the Fifth Circuit has held that the ICCTA "can sometimes support complete preemption." *Id*. (citing *PCI Transp., Inc. v. Fort Worth & W.R.R.Co.*, 418 F.3d 535 (5th Cir. 2005)). Assuming that the ICCTA can completely preempt a state claim, the *Fayard* Court said that "the question remains *which* claims are so preempted" and the Court focused on whether "the ICCTA provides private redress for the kind of nuisance claims that the Fayards are advancing." *Id*. at 47. Finding "no Board or court precedents entertaining ICCTA claims seeking redress for railroad conduct akin to nuisance," the First Circuit concluded that the ICCTA does not "clearly provide a federal cause of action amounting to nuisance." *Id*. at 48. The *Fayard* Court observed that even if there is a potential preemption defense, there must still be a "federal cause of action;" otherwise, the complete preemption doctrine "would license wholesale

8

transfer of state law claims into federal court." *Id.* at 48. Concluding that the district court erred in finding jurisdiction, *Fayard* wrote:

> Finally, where a clear cut federal cause of action exists focusing on the same wrong or harm, then *some* redress is potentially available to an injured party - - even if it is less complete than the supplanted state claim; but absent a clear cut federal cause of action, a danger exits of creating gaps in protection by categorically supplanting state claims with non-existent federal remedies. By contrast, where the state claim is left intact, federal interests are still largely protected: nothing prevents a preemption defense from being asserted, albeit in state courts.

*Id.* at 49.

### B. Complete Preemption under the ICCTA

The battle lines on this issue are drawn by the parties' attempts to characterize each other's legal theories, including the scope of the ICCTA and the STB's oversight. Canadian National views its own claim purely as a matter of state law, since it depends upon the proper interpretation of the language of an easement. If Canadian National is correct, the Court agrees that the case does not belong in federal court and is akin to the nuisance claim in *Fayard*.

MMA views the crucial issue differently. Pointing out that the easement itself defines its scope in terms of the TRA, MMA contends that trackage rights are expressly regulated by the ICCTA. MMA observes that, after Canadian National obtained the easement, it went to the STB and filed a Notice of Exemptions under federal regulation—an act that MMA contends reflects the federal nature of Canadian National's rights. MMA presses its view that the legal rights in dispute in this case are interwoven with the STB's explicit regulatory authority.

9

MMA explains that the ICCTA and STB's reach is so vast that ratification of the easement required STB oversight and "had no force or effect—for purposes of allowing [Canadian National] to exercise any rights—until it was authorized by the STB. *Def.'s Reply* at 9. Canadian National counters by citing case law and STB opinions reflecting the numerous gaps in the ICCTA and STB's regulatory scheme through which state law controls.

The issues, here, are specific: first, whether the easement, and incorporated JSA fall within the scope of the ICCTA such that Canadian National's state claims are completely preempted; and, second, whether the ICCTA provides a cause of action—either in the STB or federal court—by which Canadian National could seek relief for breach of the JSA.

### 1. Whether the ICCTA covers the easement

Turning to preemption, a careful review of the language of the easement in this case reveals that the essence of Canadian National's contention does not involve the construction of the scope of its rights under the easement itself, but rather the scope of rights defined by the a document incorporated by reference into the easement. For example, the dispute is not about where the easement lies, the duration of the easement, the retained rights of the grantor, or other issues that would be resolved by application of state law, and MMA does not contest that the easement grants Canadian National certain rights. Instead, the dispute centers upon MMA's assertion that those rights are defined solely by reference to another document that falls squarely within the aegis of the ICCTA.

The Court sides with MMA on this issue. When describing Canadian National's easement rights, the easement reads:

> [Canadian National] . . . shall have the right to make every use of the Easement Area for [its] purposes in accordance with the terms and provisions of the Trackage Rights Agreement.

*Compl.* Ex. A at 1. The operative document, therefore, is not the easement, but the TRA, the terms of which the easement incorporates by reference. If the enforceability of the TRA is a matter that falls within the purview of the ICCTA, Canadian National's state claim is completely preempted. To answer this question, the Court looks to the plain meaning of the statute.

Section 10501(b) of the ICCTA provides:

The jurisdiction of the Board over --

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, **rules (including car service, interchange, and other operating rules), practices, routes, services**, and facilities of such carriers; and

> (2) the construction, acquisition, **operation**, abandonment, or discontinuance of spur, industrial, team**, switching,** or side tracks, **or facilities**, even if the tracks are located, or intended to be located, entirely in one State,

**is exclusive**. Except as otherwise provided in this part, **the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law**.

(emphasis added). In the Court's view, the plain language of § 10501(b) grants the STB exclusive jurisdiction over the dispute that is the subject of this cause of action. *See Pejepscot Indus. Park, Inc.*, 215 F.3d at 201 (stating that "[t]he words of the statute are the first guide to any interpretation of the meaning of the statute"

11

(quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 192 (1st Cir. 1999)). The easement explicitly relies on the TRA to supply its terms and scope, and the TRA's recitation (and reservation) of rights includes language specifically covered by § 10501(b), including train operation ("BAR hearby grants to CN the right to operate its trains, locomotives, cars and equipment . . . ."); to operating rules ("CN shall be authorized to operate up to two (2) trains in each direction over the Subject Trackage during any twenty-four (24) hour period"); to practices ("When operating over the Subject Trackage, CN's locomotives and crews will be equipped to communicate with the appropriate BAR dispatcher/operator on radio frequencies normally used by BAR . . . ."); to switching ("CN shall not use any part of the Subject Trackage for the purpose of switching . . . ."); and to facilities ("CN shall provide and maintain at its expense all communication facilities needed by CN for its operation over the Subject Trackage."). *Def.'s Mot.* at Ex. B, *Tracking Rights Agreement* (*TRA*). Comparing the STB's statutory authority to the terms of the TRA, the Court concludes that the STB has jurisdiction over this controversy under § 10501(b) of the ICCTA.

Similarly, the Court does not regard as persuasive the STB's "reiterate[ion] time and time again that it has no role to play in such actions under state contract and property law," *Pl.'s Mot.* at 6-7. The STB's disinclination to hear a state contract case does not speak to this Court's jurisdiction over cases as tightly bound to the ICCTA as the instant case. The Court views this case as similar to *PCI Transport*, the Fifth Circuit case, the First Circuit cited in *Fayard*, where a battle

12

between a rail cargo distributor and a railroad about demurrage fees and switching rights, though framed by the plaintiff as a state contract action, was deemed completely preempted by the ICCTA. *See PCI Transp.*, 418 F.3d at 542-43.

Considering the subject matter covered by the TRA and the explicit statement of preemption in the statute, the Court concludes that the Defendant has sustained its burden to demonstrate complete preemption.

### 2. Whether the ICCTA provides a cause of action

Having concluded that the ICCTA speaks to the easement and TRA, the Court next considers whether there the ICCTA provides a federal cause of action. The clearest suggestion that the ICCTA provides a cause of action is found in the language of § 11704©(1):

> A person may file a complaint with the Board under section 11701(b) of this title or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.[5]

On this issue, the Court is guided by *Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co.*, where the First Circuit considered whether jurisdiction over a rail carrier's violation of a provision of the ICCTA requiring carriers to provide service upon reasonable request was exclusive to the STB, or whether federal courts retained concurrent jurisdiction. *Pejepscot Industrial Park*, 215 F.3d at 197. The First Circuit held that § 11704©(1) granted concurrent jurisdiction to federal courts

---

[5] Section 11704(b) provides:

> A rail carrier providing transportation subject to the jurisdiction of the Board under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part. A rail carrier providing transportation subject to the jurisdiction of the Board under this part is liable to a person for amounts charged that exceed the applicable rate for the transportation.

13

and to the STB. 215 F.3d 195, 204 (1st Cir. 2000). *Id.* at 205. While acknowledging that arguments both for and against concurrent jurisdiction can be drawn from the language and structure of the ICCTA, its legislative history, and case law, the Court noted that "The thrust of the statute is to federalize these disputes, not to deprive the federal courts of jurisdiction." *Id.* at 204-205.

This Court follows the First Circuit's logic. In *Pejepscot Industrial Park*, there was no doubt as to the relevance of the ICCTA. The only issue was jurisdiction. Here, given the ICCTA's clear envelopment of the TRA, the Court likewise concludes that § 11704(c)(1) provides the requisite cause of action, and that jurisdiction is properly in federal court.[6]

The Court issues this decision hastily since Canadian National has moved for a TRO and it is essential to make a quick decision about whether the Court has jurisdiction at all. This Order is not intended to foreclose the complete preemption question and if Canadian National wishes to refile a motion to remand, it is free to do so. The Court will consider any such refiling on its merits and, although the Court views this decision as correct, it may arrive at a different conclusion upon more deliberate and thorough reflection. Accordingly, the Court is dismissing Canadian National's motion to remand without prejudice.

### III. CONCLUSION

---

[6] By virtue of the reference in §11701(c) to subsection (b), there must be a violation of the ICCTA in order for a cause of action to exist. As MMA notes, the parties needed the STB's blessing in order to ratify the TRA. *See Def.'s* Opp'n at 9. Based on the principles in *Pejepscot Industrial Park*, the Court concludes that a claimed violation of an STB-sanctioned agreement, the subject of which is squarely within the STB's § 10501(b) authority, could provide the basis for a § 11704(c)(1) cause of action. However, the parties did not brief this issue and the Court's research revealed no case law directly on point.

14

The Court DISMISSES Canadian National Railway's motion to remand without prejudice (Docket # 12).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 9th day of November, 2010