UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CANADIAN NATIONAL | ) | |
| RAILWAY COMPANY AND | ) | |
| WATERLOO RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:10-cv-00452-JAW |
| | ) | |
| MONTREAL, MAINE & ATLANTIC | ) | |
| RAILWAY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION AND TO DISMISS OR STAY LITIGATION AND COMPEL ARBITRATION**

Canadian National Railway Company as plaintiff and Twin Rivers Paper Company LLC as intervenor move for preliminary injunction to enforce an easement granted by Montreal, Maine & Atlantic Railway, Inc. (MMA) which Canadian National and Twin Rivers contend allows Canadian National direct access to service the paper mill. Beyond denying the claim, MMA moves to compel arbitration. The Court denies the motions.[1]

## I. STATEMENT OF FACTS

### A. Procedural History

On October 29, 2010, Canadian National Railway Company and its wholly owned subsidiary, Waterloo Railway Company (collectively "Canadian National" or

---

[1] The Court commends all counsel on their excellent written and oral presentations. Also the Court acknowledges the parties' expectation of a quicker decision and regrets the length of time it has taken to issue this order.

"CN"), filed a complaint in Aroostook County Superior Court, state of Maine, against Montreal, Maine & Atlantic Railway, Inc. (MMA), alleging that MMA is breaching a recorded easement over a portion of its railroad tracks (the Subject Trackage) that allows Canadian National to serve the Twin Rivers paper mill in Madawaska, Maine. *Notice of Removal* (Docket # 1) Attach. 1 ¶¶ 9, 10 (Docket # 1) (*Compl.*). On the same day, Twin Rivers Paper Company, LLC ("Twin Rivers" or "TR"), owner of the Twin Rivers paper mill, moved to intervene. *Id.* at Attach. 11. On November 1, 2010, MMA removed the case to federal court. *Notice of Removal*. Twin Rivers again moved to intervene. *Mot. to Intervene* (Docket # 5) (*TR Mot.*). Over MMA's objection, the Court granted Twin Rivers' motion. *Order on Mot. to Intervene* at 16 (Docket # 50).

### 1. Motion for Preliminary Injunction

On the same day MMA removed the case to this Court, Canadian National moved for a temporary restraining order and preliminary injunction. *Emergency Mot. for a TRO and Related Relief and for Entry of Prelim. Inj. Pursuant to Rule 65, M.R.Civ. P.* (Docket # 4) (*CN Prelim. Inj. Mot.*). Canadian National later filed a supplemental memorandum in support of its motion. *Pls.' Supplemental Mem. of Law in Support of Mot. for Emergency Injunctive and Related Relief* (Docket # 35) (*CN Supplemental Mem.*). Twin Rivers filed its own memoranda in support of Canadian National's motion. *Mem. of Law of Twin Rivers Paper Company, LLC, in Support of Pls.' Mot. for Emergency Injunctive and Related Relief* (Docket # 6) (*TR Mem. in Support*); *Supplemental Mem. of Twin Rivers Paper Company, LLC, in*

Support of Pls.' Mot. for Emergency Injunctive Relief. (Docket # 37) (*TR Supplemental Mem. in Support*). MMA opposed the motion. *Montreal, Maine & Atlantic's Opp'n to Canadian National Railway Co.'s Mot. for TRO* at 2 (Docket # 42) (*Def.'s Prelim. Inj. Opp'n*). Canadian National replied to the opposition. *Pls.' Reply to Def.'s Opp'n to Pls.' Mot. for TRO* (Docket # 44).

Canadian National withdrew the motion for TRO but maintained its motion for preliminary injunction. *Pls.' Withdrawal of Request for TRO and Request for Status Conference on Mot. for Prelim. Inj.* (Docket # 53). In anticipation of a December 20 – 22 preliminary injunction hearing, the parties submitted pre-hearing memoranda. *Pls.' Pre-Trial Mem.* (Docket # 80) (*CN Pre-Trial Mem.*); *Intervenor Twin Rivers Paper Company, LLC's, Pre-Hearing Brief* (Docket # 82) (*TR Pre-Trial Mem.*); *Montreal, Maine & Atlantic's Prelim. Inj. Hr'g Br.* (Docket # 83) (*MMA Pre-Trial Mem.*). After the hearing, Canadian National and MMA submitted post-hearing memoranda. *Pls.' Post-Trial Mem.* (Docket # 100) (*CN Post-Hr'g Mem.*); *Montreal, Maine & Atlantic's Post-Prelim.-Inj.-Hr'g Br.* (Docket # 109) (*MMA Post-Hr'g Mem.*).

### 2. Motion for Arbitration

On November 18, 2010, MMA moved to compel arbitration and to dismiss or stay the case pending the outcome of arbitration. *Montreal, Maine & Atlantic's Mot. to Dismiss or Stay Litigation and Compel Arbitration* (Docket # 51) (*MMA Arbitration Mot.*). Canadian National opposed the motion. *Pls.' Opp'n to Def.'s Mot. to Dismiss or Stay Litigation and Compel Arbitration* (Docket # 67) (*CN Opp'n to*

*Arbitration*).  MMA replied.  *Reply to Canadian National's Opp'n to Montreal, Maine & Atlantic's Mot. to Dismiss or Stay Litigation and Compel Arbitration* (Docket # 71) (*MMA Reply Arbitration Mem.*).

## B.    Factual Background

### 1.    The Parties

The Twin Rivers paper mill is located in Madawaska, Maine.[2]  *CN Prelim. Inj. Mot.* at 9; *Def.'s Prelim. Inj. Opp'n* at 2.[3]  Madawaska is located at the northernmost boundary of Maine, separated from Canada by the St. John River.  Twin Rivers is the successor to Fraser Paper, Inc.  *CN Prelim. Inj. Mot.* at 5.  Twin Rivers manufactures and sells specialty, coated papers for worldwide distribution and employs approximately 680 workers at the mill.  *Id.*  Like Fraser before it, to get paper to market, Twin Rivers relies significantly on rail.

The Twin Rivers mill is serviced by MMA (previously the Bangor & Aroostook Railroad Company (BAR)).  MMA is a relatively small, regional railroad with approximately 750 miles of track; it serves northern New England, including central and northern Maine, and southeastern Canada.  *CN Prelim. Inj. Mot.* at 5; *Test. of Robert C. Grindrod* 7:23–24 (Docket # 103) (*Grindrod Day 1 Tr.*).  MMA has traditionally loaded Twin Rivers' paper products at the mill and transported the paper to junctions where MMA has connected with larger railroads, which then ship the product throughout the United States and Canada.

---

[2] Twin Rivers, formerly known as Fraser Paper, was once owned by Fraser Papers, Inc.

[3] For convenience, the Court has cited facts in the parties' memoranda for propositions that are not disputed.

Canadian National is "one of the largest rail carriers in North America and operates transcontinental railroad lines in the United States in Canada." *CN Prelim. Inj. Mot.* at 4. It says it is "unique among North American railroads, in that it provides transportation services east to west, from the Atlantic to the Pacific coasts, and north to south, from Canada to the Gulf of Mexico." *Id.* In the northeast, it "has a junction with the railroad lines of [MMA]" at St. Leonard, New Brunswick, Canada. *Id.*

### 2. The Interlocking Relationship

The manufacture, transportation, distribution, and sale of paper could theoretically be a single industry with one entity assuming all functions from wood harvesting to paper making to delivery to the consumer; however, both paper mills and railroads are capital intensive businesses and operated by people with highly specialized knowledge. People who know how to run a mill do not know how to run a railroad and vice versa. As a result, some of the highly specialized functions of manufacture and transportation have been compartmentalized. As conceived, the relationship between the mill and the railroad is synergistic: the mill needs the railroad to bring raw material and to ship finished paper, the railroad needs high volume customers, and they work together to their mutual profit.

Years ago, with this model presumably in mind, the BAR laid a set of railroad tracks along the Maine side of the St. John River to what was then the Fraser mill. Once the railroad tracks were laid, no one was going to build another set and the result is that MMA now exclusively owns the only railroad tracks with direct access

to the mill. *Id.* at 9; *Def.'s Prelim. Inj. Opp'n* at 3. Historically, MMA and, before it, BAR have been the only rail carriers to directly serve the mill. *Def.'s Prelim. Inj. Opp'n* at 3. While economic times were good, the business relationship was mutually beneficial. Twin Rivers, MMA, and Canadian National each understood their respective roles and profited from their relationship.

### 3. Economic Tensions in the Paper and Railroad Business

More recently, however, economic times in the paper and railroad industries have not been good. On August 15, 2001, certain BAR creditors filed an involuntary Chapter 11 bankruptcy proceeding against BAR and in December 2001, the bankruptcy court entered an order for relief under Chapter 11. *Howard v. Surface Transp. Bd.*, 389 F.3d 259, 262 (1st Cir. 2004). In the spring of 2009, Twin Rivers' predecessor, Fraser Paper, Inc., followed suit, entering into bankruptcy. *Test. of Jeffrey C. Dutton* 32:7–9 (Docket # 106) (*Dutton Tr.*).

### a. Twin Rivers' Perspective

As Twin Rivers produced less paper, MMA gave Twin Rivers less service, and the level of service and its cost became a sore point between Twin Rivers and MMA.[4] At one point, MMA trains came to Twin Rivers six days a week, but as the volume of paper decreased, MMA gradually reduced its schedule and is now servicing the mill only three days a week. *Id.* 7:8–25; 8:19–22. MMA's reduced schedule and cost structure have played havoc with Twin Rivers' attempts to regain its competitive edge. Jeffrey Dutton, the Chief Executive Officer of Twin Rivers,

---

[4] Much of this history took place between Fraser and BAR but for simplicity, the Court refers to the current companies.

explained that its customers' need for paper is date-specific, and Twin Rivers is obligated to put its paper in its customers' hands to accommodate the customers' production schedule. *Id.* 8:1–11. Furthermore, Twin Rivers, not the customer, is responsible for the cost of transportation, and as the finished product awaits shipment, this drives up Twin Rivers' inventory and financing costs. *Id.* 8:1–11; 9:4–13.

The issue is not just service, it is cost. According to Mr. Dutton, MMA quoted Twin Rivers a price of $1,586 to load its paper at the Twin Rivers' mill and transport that paper the 24-mile run to St. Leonard, where it would be transferred to Canadian National. *Id.* 10:8–14. By comparison, Canadian National was taking the same paper all the way to Montreal for about one-third the price. *Id.* 10:15–19. Mr. Dutton said that the escalated MMA price "doesn't seem reasonable" and puts Twin Rivers at a competitive disadvantage. *Id.* 10:15–23.

### b.    MMA's Perspective

MMA and Twin Rivers do not disagree about much of the history or even the desirable solution. Both would prefer a competitive productive mill in Madawaska and efficient cost-effective rail service. A major problem, however, is that their separate operations are so complex and intertwined that when the mill falters, the railroad must cut its own costs by cutting service. As the mill prospers, the railroad is not able to quickly react.

Robert C. Grindrod, the President and Chief Executive Officer of MMA, explained MMA's perspective. He testified that in June 2008, MMA had 325

employees; as of December 2010, the number had been reduced to 174. *Grindrod Day 1 Tr.* 8:2–5. In the fall of 2010, MMA had 205 employees, but as a result of the controversy with Twin Rivers, it had reduced that number by 31 in the weeks approaching the December 2010 hearing. *Id.* 8:6–9. He later added that MMA owns or rents approximately 350 railroad cars to service Twin Rivers. *Id.* 21:20–22.

Mr. Grindrod testified that currently MMA is providing "switching services" to Twin Rivers "six days per week, Sunday through Friday." *Test. of Robert C. Grindrod* 13:18–22 (Docket # 104) (*Grindrod Day 2 Tr.*). He also testified that MMA has trains going out of Madawaska and heading for St. Leonard four times per week. *Id.* 15:12–20. Although he understands that Twin Rivers would like MMA to provide a greater frequency of shipments and switching, he testified that "[t]here isn't an economic justification for it." *Id.* 16:10–12.

Turning to the issue of cost, Mr. Grindrod said that when he came to MMA in 2003, MMA was receiving "somewhat more than $500 per car" under the haulage agreement. *Id.* 37:6–10. Mr. Grindrod explained the two ways that a railroad company can bill a customer: division and haulage. Under the division method, the local or originating carrier, here MMA, is in charge of putting together the commercial deal for moving the freight from its origin to its destination, obtaining agreed-upon amounts that other carriers will charge for their portions of the trip, and putting together a package for the shipping customer. *Id.* 38:4–14. Under the division system, MMA was receiving about $1,100 to $1,200 to ship Twin Rivers'

product from Madawaska to St. Leonard, where it was transferred to Canadian National. *Id.* 39:8–13.

The second method is called haulage. Under this system, another railroad, in this case Canadian National, has the right to strike the commercial deal directly with Twin Rivers and under the haulage agreement that Canadian National negotiated with Twin Rivers, it subcontracted with MMA to move Twin Rivers' freight to St. Leonard for $500. *Id.* 39:14–20.

Mr. Grindrod said that in anticipation of the existing haulage agreement coming up for renewal at the end of October 2010, he got in touch with Canadian National in July 2009 and informed Canadian National that MMA was interested in renewing the haulage agreement. *Id.* 35:1–9. After an initial expression of interest by Canadian National, he received word that Canadian National was not interested in renewing the haulage agreement. *Id.* 35:1–12.

The upshot of Mr. Grindrod's testimony was that MMA's prices to Twin Rivers were the result of Canadian National's negotiated rate and when MMA offered to continued the current rate, it was Canadian National that decided not to do so.

### c. The MMA–Twin Rivers' Relationship Collapses

Whatever the cause, the business relationship between Twin Rivers and MMA became viral. Mr. Dutton described the relationship as "difficult" and "expensive." *Dutton Tr.* 7:10. He expressed frustration that MMA had not "taken a

more active role in determining what we need from a service perspective and working with us to get there." *Id.* 10:3–7. Mr. Dutton said:

> I'm indifferent to who we work with. If MMA can get their costs to something that's competitive and can improve their service levels and we're convinced that they will, you, know, we have no . . . issue with MMA either participating in whole or in part with this arrangement that we have with the CN.

*Id.* 18:1–8. At the same time, Mr. Dutton acknowledged that he has a "demeanor problem" with Mr. Grindrod and with Mr. McGonigle, MMA's marketing manager. *Id.* 15:12–14. Mr. Dutton described the relationship with MMA as "awful, unlike anything [he] had ever seen." *Id.* 35:23–25. The Twin Rivers' relationship with Mr. McGonigle got so bad that when people from Twin Rivers had to visit the MMA office, Mr. McGonigle had to go outside and sit in a car. *Id.* 19–22.

### 4. The Business Divorce

Given its location, Twin Rivers must ship a substantial percentage of its product by rail since most of its customers fall outside the ideal truck freight circle; its optimal percentage of rail transport would be about 80%. *Id.* 12:20–25; 13:1–2; 14–23. With MMA as its historic shipping partner, for Twin Rivers to extricate itself from a formerly symbiotic business relationship with MMA is equivalent to a complex and messy divorce.

To begin, MMA owns the entire set of tracks both leading to and from and actually in Twin River's yard. Twin Rivers has two routes by which it can ship its product by rail, both of which are on the Maine side of the border between the United States and Canada, and both of which are owned by MMA. The first set of

tracks proceeds west and then south over what is known as the Madawaska subdivision. *Def.'s Prelim. Inj. Opp'n* at 3. The second set of tracks proceeds east, initially on the remaining portion of the Madawaska subdivision and then, at Madawaska Milepost 264.13 (also known as Van Buren Milepost 0.0), onto the Van Buren subdivision to Van Buren, Maine. The tracks then cross the St. John River into to St. Leonard, Canada, where they connect to tracks owned by Canadian National. *Id.* at 3–4.

Despite MMA's stranglehold on Twin Rivers, the solution for Twin Rivers was obvious: Canadian National. The so-called Madawaska subdivision is hopeless for Twin Rivers since shortly after leaving west from Madawaska, it dives deeply into the Maine woods and does not emerge until Millinocket and later in Hermon, Maine, just south of Bangor. However, the Van Buren subdivision has potential. If Canadian National could take the place of MMA on the Van Buren subdivision, Canadian National could pick up Twin Rivers' paper products at the Madawaska mill and transport them down the Maine side of the St. John, over the river to St. Leonard, where Canadian National could commence its trip to Montreal and beyond. From Twin Rivers' perspective, the Canadian National alternative seemed ideal, freeing Twin Rivers from MMA, and it viewed as MMA's exorbitant pricing structure, ineffective service, and annoying executives. Twin Rivers commenced discussions with Canadian National.

5. **Canadian National, MMA, and the Easement, the Trackage Rights Agreement, and the Junction Settlement Agreement**

Fortuitously, Canadian National had the solution: some time ago, it had purchased from BAR an easement, trackage rights, and a junction settlement agreement over the Van Buren subdivision. Like most businesses that go bankrupt, BAR's financial problems did not come overnight. When Frederick Yocum began consulting for BAR in 1999, he immediately recognized that it "had cash problems" and "operating issues." *Test. of Frederick W. Yocum, Jr.* 17:1–5 (Docket # 99) (*Yocum Tr.*). One solution was to "drain[] commercial assets to Canadian National for $5 million." *Id.* 19:24–25;20:1–3.

The result was that in March 2001, BAR executed three agreements with Canadian National. In the first, an Easement dated March 15, 2001, BAR granted Canadian National:

> A perpetual, non-exclusive EASEMENT for the use and benefit of Grantee, its successors and assigns, for the uses and purposes defined and described in that certain Trackage Rights Agreement dated march 14, 2001 by and between Grantor and Canadian National Railway Company ("CN") (the "Trackage Rights Agreement"), over, upon and across the premises described in Exhibit A attached hereto and incorporated herein by reference (the "Easement Area"), situated in the County of Aroostook, State of Maine.

Ex. G at 1 (*Easement*). "Exhibit A" describes the deeded property:

> A portion of the line of railroad known as the Van Buren Branch of the Bangor and Aroostook Railroad, all in the State of Maine, extending from a point of connection with the main Line in Madawaska (Milepost 264.13, Milepost V0.0), and running through Madawaska, St. David, Grand Isle, Lille, Notre Dame, Parent, Violette, and Keegan, to Van Buren (Milepost V24.1), all in the County of Aroostook, a distance of about 24 miles, as the same is now laid out, located and constructed.

*Id.* at 8. The Easement references a Trackage Rights Agreement (TRA), the second of the three agreements executed in March 2001, which provides in part:

> (a) CN shall have the right to enter and exit the Subject Trackage only at the connections MP 0.70 at St. Leonard, NB and at MP 0.0, Madawaska subdivision, Madawaska, ME, for the receipt or delivery of local traffic from and to the Fraser / Nexfor facility located in Madawaska, ME. . . .
>
> (d) Except as may otherwise be provided by this Agreement, CN shall not use any part of the Subject Trackage for the purpose of switching, storage, or servicing cars or equipment, or the making or breaking up of trains . . . .

Ex. F at 2 (*TRA*). The third agreement executed in March was a Junction Settlement Agreement (JSA). Ex. E at 1 (*JSA*). The JSA allowed Canadian National to negotiate directly with Twin Rivers for transportation of Twin Rivers' products from the mill, and provided that Canadian National would sub-contract to MMA the switching services required by Twin Rivers at the mill. *Id.* at 3. In other words, the JSA gave Canadian National direct commercial access to Twin Rivers while leaving direct physical access in the switching yard with MMA. *Id.* In consideration for these three agreements, Canadian National paid BAR $5 million. *CN Prelim. Inj. Mot.* at 11–12; *Def.'s Prelim. Inj. Opp'n* at 5.

Armed with these agreements, Canadian National seemed primed to answer Twin Rivers' desire to dispense with MMA and to deal with a more reasonable and cost-effective rail carrier.

## 6.    A Question of Interpretation

The solution, however, was not that simple; precisely what Canadian National purchased—direct physical access to the mill itself, physical access only to Milepost 0.0, or direct commercial access to the mill—remains a matter of intense dispute and is the primary subject of this litigation. When Canadian National

informed MMA in June 2010—as the JSA approached its October 31, 2010, expiration[5]—that it wished to exercise its rights under the Easement and TRA and directly service Twin Rivers, MMA responded that Canadian National had no such right. *CN Prelim. Inj. Mot.* at 13; *Def.'s Prelim. Inj. Opp'n* at 6–7. In MMA's view, under the Easement and TRA, Canadian National was only permitted physical access to Milepost 0.0, leaving Canadian National approximately three quarters of a mile shy of the mill. *CN Prelim. Inj. Mot.* at 13; *Def.'s Prelim. Inj. Opp'n* at 6. Believing that in executing the easement the parties originally intended to provide Canadian National direct access to the mill, Canadian National concluded that the reference to Milepost 0.0 in the TRA and Easement was a mutual mistake. *CN Prelim. Inj. Mot.* at 13–14.

After Canadian National filed suit on October 29, *Compl.*, MMA offered Twin Rivers and Canadian National a "Rule 11" arrangement, essentially extending the terms of the JSA. *Def.'s Prelim. Inj. Opp'n* at 7. Since Canadian National and Twin Rivers moved for a preliminary injunction, the two instituted a transloading agreement in which Twin Rivers trucks its product across the St. John River to Edmundston, where they are loaded onto Canadian National trains, thereby bypassing MMA altogether.

## II.    THE PARTIES' POSITIONS

### A.    MMA's Position on Arbitration

MMA argues that, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, this case should be dismissed or stayed pending arbitration and that the Court

---

[5] The JSA had been extended on March 1, 2006. *CN Prelim. Inj. Mot.* at 11.

should compel arbitration pursuant to Article 20 of the TRA. *MMA Arbitration Mot.* at 1–2. MMA says that "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." *Id.* at 1 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857 (2010)). It quotes First Circuit and statutory law holding that "[a] Court *must* compel arbitration for disputes that it determines are subject to the arbitration clause." *Id.* at 3 (emphasis in original).

According to MMA, the TRA is the operative document that sets forth the trackage rights at issue. *Id.* at 4–5. In its view, the Court need not consider whether the TRA is incorporated by the Easement, since "[t]he parties' dispute arises under the TRA." *MMA Reply Arbitration Mem.* at 1–2. It then points to Article 20 of the TRA, which states that "[a]ny irreconcilable dispute between the parties with respect to this Agreement shall be resolved by submitting it to arbitration pursuant to the provisions of this Article. The decision of the arbitrators shall be final and conclusive upon the parties hereto." *MMA Arbitration Mot.* at 5; *TRA* at 15.

MMA also rejects the argument that the arbitration clause excepts Canadian National's claims by virtue of its statement that "[t]he arbitrators shall have no power to change any of the provisions of this Agreement in any respect (nor shall the arbitrator have the power to make an award of reformation) and the jurisdiction of the arbitrators is hereby expressly limited accordingly." *MMA Arbitration Mot.* at 5; *MMA Reply Arbitration Mem.* at 4–6; *TRA* at 15. It argues that the arbitration

clause "governs remedies rather than carving out specific claims that are non-arbitrable in the first instance." *MMA Arbitration Mot.* at 6.

So concluding, MMA says that all four of the Plaintiffs' claims should be dismissed as they all stem from the TRA and are subject to arbitration. *Id.* at 7. In the alternative, "at the very least," MMA requests a stay under 9 U.S.C. § 3. *Id.*; *MMA Reply Arbitration Mem.* at 6–10.

## B. Canadian National[6]

Canadian National invokes the traditional four-factor test for issuance of a preliminary injunction.[7] *CN Pre-Trial Mem.* at 1.

### 1. Success on the Merits

Turning to the first factor, reasonable likelihood of success, Canadian National makes several arguments. First, invoking *res judicata*, Canadian National says that a ruling by the First Circuit in *Howard v. Surface Transportation Board*, relating to MMA's bankruptcy proceeding, adopted findings of fact that the easement extends to the mill. *Id.* at 3–4; *CN Post-Hr'g Mem.* at 2–3. Canadian National argues that the requisite *res judicata* criteria are met and that the First Circuit's statement that "[t]he Madawaska line runs from the Fraser paper mill in Madawaska, Maine to an interchange with a CN line at St. Leonard, New Brunswick, Canada," conclusively settles the matter. *CN Pre-Trial Mem.* at 4; *CN Post-Hr'g Mem.* at 2–3. Canadian National says that, to the extent any additional

---

[6] Canadian National incorporates by reference its memoranda of law in support of its Motion for Temporary and Preliminary Injective Relief. The recitation of Canadian National's argument consists of assertions made in its Motion for Temporary and Preliminary Injective Relief, Pre- and Post-Trial Memorandum, and at the preliminary injunction hearing.

[7] See *infra* Part III.B.

facts are necessary, the evidence at trial shows that "use of the Milepost 0.0 terminus is in plain error, which if not corrected, will permit MMA to continue to enforce a perfectly senseless and monopolistic, yet self serving interpretation, of the Easement Deed and the TRA." *CN Pre-Trial Mem.* at 6.

Second, applying "conventional principles of deed and contract interpretation," Canadian National regards its chances as "closer to a substantial 'probability.'" *CN Prelim. Inj. Mot.* at 14; *CN Supplemental Mem.* at 3. In Canadian National's view, the plain language of the TRA providing that "CN shall have the right to enter and exit the Subject Trackage . . . for the receipt and delivery of local traffic from and to the [Twin Rivers] facility" forms a sufficient basis, standing alone, for Canadian National's success on the merits. *Id.* at 15.

Third, it says that should the Court find the contractual language insufficient to confer direct access, the evidence proves the existence of a mutual mistake: that the parties actually intended the easement to terminate at the mill. Canadian National points to the testimony of Myles Tobin, vice president of United States legal affairs for Canadian National when the contracts were executed, and concludes that Mr. Tobin's testimony "was unequivocal: the TRA was designed to reflect both parties' intent to permit CN to directly access the Fraser plant with its own locomotives, serve the shipper, and spot and pull cars—independent of BAR or any other intermediary—at Canadian National's discretion." *CN Post-Hr'g Mem.* at 3. Canadian National also asserts that testimony from BAR's bankruptcy proceedings establishes a mistake on MMA's part. According to Canadian National,

"[i]n multiple proceedings before the bankruptcy court and the STB, MMA expressly and repeatedly admitted . . . that Canadian National possesses the right to directly serve the Twin Rivers Paper Mill." *CN Prelim. Inj. Mot.* at 15. Reciting several statements made by MMA and its chairman purportedly showing Canadian National's right to access the Twin Rivers mill via the Subject Trackage, Canadian National reasons that "MMA cannot now reasonably or rationally dispute in this Court what it has admitted so often and so clearly before the other tribunals . . . ." *Id.* at 15–16.

Canadian National also points to documents surrounding execution of the Easement and TRA. It says that the parties' intent is proven by the JSA's statement that "BAR will provide haulage service for the account of CN between the CN/BAR interchange in St. Leonard, NB and the Fraser Paper mill located on the BAR at Milepoint 0.0 of the Van Buren subdivision in Madawaska, ME . . . ." *CN Post-Trial Mem.* at 4. It says that letters between the parties during negotiations of the Easement and TRA further show their intent. *Id.* at 4–5.

Fourth, Canadian National rejects MMA's notion of the "status quo." Canadian National says that it is impossible to return to the pre-October 29, 2010, state of affairs since "the Joint Settlement Agreement under which the parties operated in that prior world has expired, permanently." *CN Pre-Trial Mem.* at 12. Thus, "the only attainable *status quo* is that described by" the Easement and TRA. *Id.*

Finally, Canadian National asserts that, even ignoring the text of the TRA and MMA's prior statements, "MMA's current position cannot withstand scrutiny under a simple common sense analysis." *CN Prelim. Inj. Mot.* at 16. Canadian National views as absurd the notion that it paid $5 million:

> for (1) the right to deliver cars to a point just short of the mill, there to hand the traffic over to MMA at whatever toll MMA chose to exact; and/or (2) the right to reach the mill, but without the right to perform the necessary services to deliver incoming freight and pick up outgoing freight, once again forced to pay whatever toll MMA might exact.

*Id.* at 16–17.

## 2. Irreparable Harm

Turning to the second preliminary injunction factor, Canadian National cites as irreparable harm its inability to use a property right it purchased and its deprivation of Twin Rivers' goodwill. *CN Pre-Trial Mem.* at 14. Canadian National argues that the First Circuit has recognized loss of private property rights and harm to goodwill as an irreparable harm. *CN Supplemental Mem.* at 4; *CN Post-Hr'g Mem.* at 10.

Canadian National says that property rights "by their nature, are inherently unique, as there are no alternatives for Canadian National to provide the competitive rail service that the rights were meant to secure . . . ." *CN Supplemental Mem.* at 5. It asserts that it could not be made whole or compensated for the loss of its property rights by a monetary recovery at the conclusion of the case. *Id.* Canadian National argues similarly that it could not be financially compensated for the good will that will be lost from its relationship with Twin Rivers and from "those industries that ship freight to or receive freight from the

Twin Rivers Mill." *Id.* In support, Canadian National cites cases from the First and Seventh Circuits, the Eastern District of Washington, and the District of Maine.

Canadian National dismisses as short-term the "cross dock" or "transloading" work-around that Twin Rivers and Canadian National have instituted whereby Twin Rivers trucks paper from Madawaska to Edmundston, New Brunswick, where it is loaded onto a Canadian National train. According to Canadian National, this work-around "is a temporary remedy to counter monopoly pricing; it is not a desirable device standing on its own merits. It is a costly alternative . . . that will not work over an extended time period." *CN Pre-Trial Mem.* at 15.

Canadian National further regards MMA's "precarious financial condition" as a potential irreparable harm. *CN Prelim. Inj. Mot.* at 22; *CN Supplemental Mem.* at 7. In Canadian National's view, MMA's "dire financial straits" make questionable the value of any monetary judgment. *CN Pre-Trial Mem.* at 16; *CN Supplemental Mem.* at 7. Canadian National cites First Circuit law (itself citing Seventh Circuit law), noting that potential insolvency of a party may make any legal remedy inadequate. *CN Supplemental Mem.* at 7 (quoting *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir. 1986) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984))).

### 3. Balance of Harms

Turning to the third factor—balancing of the respective harms—Canadian National claims an injunction will not result in any "legally-cognizable harm" to

MMA, noting that MMA would remain free to run its own trains along the Subject Trackage and to compete with Canadian National for Twin Rivers' business. *CN Prelim. Inj. Mot.* at 23. Protection from competition, Canadian National observes, is not an outcome promoted by law. *Id.*; *CN Post-Hr'g Mem.* at 10.

### 4. Public Policy

Finally, as to the fourth factor, Canadian National perceives public harm only if its motion is denied. Canadian National says that what is at stake is "the very survival of the paper industry in Madawaska, Maine . . . along with the jobs of 650 employees and those of numerous local vendors and suppliers." *CN Pre-Trial Mem.* at 16. Canadian National emphasizes the economic importance of the mill to the surrounding area, and the "ripple effects" the mill's closure would have. *CN Prelim. Inj. Mot.* at 23–24. As proof, Canadian national recounts the hundreds of mill employees, and the billion dollars that mill employees and its vendors allegedly spend in the region. *Id.* at 24. Canadian National argues that MMA's position seeks to inhibit competition—a principle "which is decidedly contrary to the public interest." *Id.*; *CN Post-Hr'g Mem.* at 10

### 5. The Arbitration Clause

Canadian National says that the arbitration clause "applies only, by its terms to disputes under the TRA, and not to disputes under the Easement Deed." *CN Pre-Trial Mem.* at 7; *CN Opp'n to Arbitration* at 6. Canadian National views MMA's argument as "dismissing the Easement Deed in its entirety as a meaningless and vestigial appendage." *CN Pre-Trial Mem.* at 7. According to Canadian National,

the First Circuit recognized the Easement as a separate agreement in *Howard* when it explained "in a third agreement, BAR granted Waterloo a non-exclusive freight easement, under which Waterloo could also operate its trains over the line." *Id.* at 8.

Canadian National says that that the relief it seeks, reformation, is expressly beyond the jurisdiction of the arbitrators. *CN Opp'n to Arbitration* at 9. According to Canadian National, "[w]hile the TRA contains any number of other provisions that may be subject to arbitration, the parties have expressly agreed *not* to arbitrate a specified subset of claims—those seeking the kind of relief that Canadian National seeks in this case." *Id.* at 10. Canadian National also challenges MMA's assertion that, by limiting the arbitrator's ability to reform the contract, the arbitration clause similarly limits the jurisdiction of this Court to reform it. *Id.* at 5–6. Canadian National says that "[t]his limitation on the power of the arbitrators to make an award of reformation sheds no light on whether a different tribunal—such as this Court—has the power to grant that remedy." *CN Pre-Trial Mem.* at 9–10. Citing First Circuit law that "[a] party can be deemed to have waived a right . . . only if the waiver represents a knowing and intentional relinquishment of that right," Canadian National says that the arbitration clause "sheds no light whatsoever on whether any purported or alleged waiver was knowing, or intentional, or purposeful." *Id.* at 10–11; *CN Opp'n to Arbitration* at 11–12. Canadian National rejects MMA's assertion that consideration of the motion for preliminary injunction might interfere with the work of the arbitrators under the

TRA since the First Circuit has already conclusively determined the matter. *CN Pre-Trial Mem.* at 13.

Finally, Canadian National says that even if the Court concludes that its claims are arbitrable, "that does not bar the Court from proceeding on Canadian National's motion for preliminary injunction." *CN Opp'n to Arbitration* at 12. Quoting First Circuit authority, Canadian National says that "a district court can grant injunctive relief in an arbitrable dispute pending arbitration, provided the prerequisites for injunctive relief are satisfied." *Id.*

### C. Twin Rivers

Twin Rivers' joins Canadian National's briefs, but adds that it faces an irreparable harm "separate and distinct from the harm that Canadian National will suffer from MMA's interference with Canadian National's property rights." *TR Mem. in Support* at 2. Twin Rivers says that it "is most vulnerable among the parties." *TR Pre-Trial Mem.* at 2. Accordingly, it rejects any assertion by MMA that the Court should not consider irreparable harm that might befall Twin Rivers. *Id.* at 2. For support, Twin Rivers points to a Southern District of California case, *San Diego Unified Port District v. Gianturco*, 457 F. Supp. 283 (S.D. Cal. 1978), in which the Court considered the potential irreparable harm to the intervenors when granting a preliminary injunction.

Twin Rivers explains that, because of its geographic location, it is "particularly reliant upon rail transportation, and therefore uniquely vulnerable to poor rail service and actual or threatened interruptions of rail service." *TR Pre-*

*Trial Mem.* at 3. It says that its potential harm extends beyond monetary damages and that absent an injunction, it faces the loss of its existing customer relationships and the ability to compete for new business. *Id.* at 4. Pointing to its interrogatory responses, Twin Rivers says that the Rule 11 rate that MMA quoted is "too costly for the Mill to sustain" and will also negatively impact "its relations with its customers due to the increased time to transport, which forces the Mill to carry more inventory and eats into its liquidity." *Id.* at 5.

As regards the transloading operations, Twin Rivers characterizes them as "temporary, stop-gap measures . . . [that] are not sustainable and . . . continue to impose substantial irreparable harm on Twin Rivers." *Id.* at 5–6. By way of example, Twin Rivers cites the increased infrastructure costs and labor costs, the reduced quality and timeliness of its products, the possible closure of the Edmundston bridge due to Homeland Security threats, and the likely shortage of trucks as the economic conditions improve. *Id.* at 6.

Twin Rivers contends the balance of harms and public policy favor the issuance of an injunction. In support, it quotes an affidavit by Donald Chasse, the Chairperson of the Board of Selectmen for the town of Madawaska, who asserts that "anything that threatens the economic viability of continuing operation of the Mill will directly threaten Madawaska's tax base and economy and, by extension, the economy of the entire region." *Id.* at 7. Mr. Chasse explained that a reduction in mill operations could threaten the livelihood of hundreds or thousands of people and

a cessation in mill operations would be "nothing short of devastating to the Town of Madawaska." *Id*.

### D. MMA's Position on Preliminary Injunction

MMA begins by disclaiming the earlier briefs. According to MMA, "[s]ince CN filed its Emergency Motion for Temporary Restraining Order . . . the facts on the ground (and CN's corresponding arguments) have altered so substantially that CN's original motion scarcely even makes sense anymore." *MMA Pre-Trial Mem*. at 1. MMA notes that the "imminent" harm that Canadian National and Twin Rivers foretold has not occurred and that Twin Rivers has since begun the transloading operation with Canadian National. *Id*. MMA rejects Canadian National's view of the status quo, asserting that "[n]ot in 85 years has a CN train rolled over MMA's tracks. Not once has the STB or any Court stated that CN would have physical access to TR. Not once has the STB or any Court ruled on milepost 0.0, or stricken Article 2(d)'s express prohibition on switching." *Id*. at 1–2.

### 1. Success on the Merits

Turning to the likelihood of success, MMA points to the text of the JSA, the Easement, and the TRA, and the interpretation of those agreements by MMA's witnesses, Fred Yocum, Bob Grindrod and Mark Rosner. *MMA Post-Hr'g Mem*. at 1–2. First, MMA says that the Easement expressly limits Canadian National to track east of Milepost 0.0. *MMA Pre-Trial Mem*. at 5. MMA highlights the Easement language stating that Canadian National's track rights extend over a "portion of the line of railroad known as the Van Buren Branch of the Bangor and

Aroostook Railroad . . . extending from a point of connection with the Main Line in Madawaska (Milepost 264.13 / Milepost V 0.0), and running . . . to Van Buren (Milepost V 24.1) . . . ." *Def.'s Prelim. Inj. Opp'n* at 8–9. According to MMA, the Easement's specific inclusion of the Van Buren Branch, and implicit exclusion of the Madawaska subdivision—the portion connecting the mill to the Van Buren Branch—requires the conclusion that the Easement does not provide for direct access to the mill. *Id.* at 9. Also MMA argues that the Easement's silence as to any "mill," "sorting yard," or "switching" supports its position. *Id.* In MMA's estimation, this is a "gaping hole" if, as Canadian National asserts, the Easement was intended to give Canadian National direct access to the mill. *Id.*

MMA next points to the language in the TRA and concludes that, as with the Easement, the TRA limits Canadian National's access to track east of Milepost 0.0. *MMA Pre-Trial Mem.* at 5 (citing *Def.'s Prelim. Inj. Opp'n* at 9–10). MMA observes that the TRA's grant of rights is defined by explicit reference to Milepost 0.0. *Def.'s Prelim. Inj. Opp'n* at 10. According to MMA, the lack of any ambiguity in this description disallows consideration of extrinsic evidence and precludes rewriting the contract. *Id.*

Responding to Canadian National's argument, MMA contends that Article 2(d) of the TRA expressly and comprehensively prohibits Canadian National from switching trains at the mill. *MMA Pre-Trial Mem.* at 5 (citing *Def.'s Prelim. Inj. Opp'n* at 10–12). In MMA's view, the TRA's silence elsewhere as to switching, when compared to the high level of detail given to other operating procedures, speaks

volumes. Moreover, MMA regards Article 2(a) as consistent with Article 2(d)'s prohibition. MMA asserts that Article 2(a)'s grant of rights to Canadian National to "enter and exit the Subject Trackage . . . for the receipt or delivery of local traffic from and to the [Twin Rivers] facility" does not speak to or imply Canadian National's right to perform switching functions. *Def.'s Prelim. Inj. Opp'n* at 11. MMA construes the "receipt or delivery" language as merely "defin[ing] the nature of the traffic [Canadian National] may carry." *Id.*

MMA next says that Canadian National is unable to prove the existence of a mutual mistake that would allow reformation of the Easement. *MMA Pre-Trial Mem.* at 5 (citing *Def.'s Prelim. Inj. Opp'n* at 12–15). Quoting *Peerless Insurance Co. v. Carleton*, 641 F. Supp. 2d 48, 52 (D. Me. 2009), MMA says "[t]he unilateral understanding of one party does not provide the mutual agreement and mutual mistake required to support [] reformation []." *MMA Post-Hr'g Mem.* at 3 (brackets in *MMA Post-Hr'g Mem.*). It asserts that as evidenced by Mr. Yocum's testimony the TRA "provided physical trackage rights by CN over the bridge and on the Van Buren subdivision to the end of that subdivision at milepost 0.0," there was no mistake on BAR's side. *Id.* (quoting *Yocum Tr.* 22:1–8). It argues additionally that "[n]ot only did CN fail to establish BAR's mistake; it failed to establish its *own intent*." *Id.* at 4 (emphasis in original). In so doing, it dismisses Mr. Tobin's testimony, saying that it "lacked credibility. He knew little or nothing about Fraser, its operations, or the rights he had supposedly negotiated. His broad assertions of CN's intent were backed by no details. And he oscillated –

inexplicably – between saying he had intended to permit switching and saying CN didn't need to switch." *Id.* at 6.

MMA points to what it says is an explicit ban on switching, and says that, because Canadian National cannot provide service to the mill without switching, the conclusion must be that the parties did not intend physical access. *Id.* Similarly, MMA points to the absence of "any affirmative switching guidelines" as also disproving Canadian National's claim that the parties intended physical access to the mill. *Id.* at 6–7.

MMA says that the evidence of mistake offered by Canadian National does not prove that the contracting parties meant to give physical access to Canadian National. *Def.'s Prelim. Inj. Opp'n* at 14. Rather, according to MMA, the parties' intent was only to allow Canadian National commercial access to Twin Rivers—that is, to allow Canadian National the opportunity to contract directly with Twin Rivers without MMA's interference. *Id.* Accordingly, the $5 million Canadian National paid to BAR was not consideration for 99 years of physical access through the Easement, but for 5 years of commercial access through the JSA. *Id.* Thus, in MMA's view, the purpose of the Easement and TRA, viewed as a whole, was to allow Canadian National the right to the pick up traffic just outside the mill while retaining for MMA the exclusive right to switch and sort traffic at the mill and the adjacent sorting yard. *Id.* at 15. In support, MMA points to industry practice and to the physical limitations of the sorting yard, which MMA claims is large enough to accommodate only one railroad company safely. *Id.*

Finally, MMA rejects Canadian National's assertion of *res judicata*. MMA says that *Howard* related to the powers of the Bankruptcy Court under 11 U.S.C. § 1170, and the First Circuit "did not examine the agreements in detail" but only referred to them for background. *MMA Pre-Trial Mem.* at 6.

### 2. Irreparable Harm

MMA declares there is a complete lack of evidence of irreparable harm. *MMA Post-Hr'g Mem.* at 7. MMA says that "[n]one testified about any harms to the Easement. None testified about any loss of goodwill," and there was testimony that Twin Rivers' transloading operation could be continued indefinitely. *Id.* MMA says that Twin Rivers' "worries were minor: snow, cold, and the threat of a 'Homeland Security alert' [were all] threats that were equally likely (or preposterous) in both Madawaska and Edmundston." *Id.* at 8. MMA urges the Court not to view the "gap" in Canadian National and Twin River's hearing testimony as an indication that "CN has somehow exempted itself from the second prong of the preliminary injunction test. A showing of irreparable harm is an 'essential prerequisite.'" *Id.*

In MMA's estimation, "nothing in this case justifies the extraordinary relief [of] upending of the *status quo*, a declaration of new rights, and the complete exclusion of MMA . . . ." *Def.'s Prelim. Inj. Opp'n* at 17–18. It argues that the trains have continued to run and MMA has continued to service Twin Rivers by way of the Rule 11 shipping rate that MMA quoted Twin Rivers. *Id.* at 18–19. Canadian National would be similarly free to quote its own Rule 11 rate to Twin Rivers. *Def.'s*

*Id.* at 19. According to MMA, because the status quo *ex ante* remains available, a preliminary injunction is inappropriate. *MMA Post-Hr'g Mem.* at 8.

MMA also rejects Canadian National's argument that it is being deprived of its property rights. *Def.'s Prelim. Inj. Opp'n* at 19. According to MMA, Canadian National continues to have the right "to operate its trains over the Van Buren subdivision, from St. Leonard to milepost 0.0," and is merely being prohibited from activities "beyond the limits of the Easement and TRA." *Id.* at 19–20. Therefore, it says the cases cited by Canadian National to show that interference with property rights is an irreparable harm are inapposite. *Id.* at 20.

MMA rejects Canadian National's claimed loss of customer goodwill. Regarding Canadian National's relationship with Twin Rivers, MMA observes that "the instant dispute appears to have drawn [Canadian National] and [Twin Rivers] even closer: they have a joint enemy in MMA." *Id.* at 21. MMA goes on to distinguish Canadian National's relationship with Twin Rivers from those cases cited by Canadian National arguably showing that loss of goodwill amounts to an irreparable harm since unlike the facts in those cases, Canadian National's relationship with Twin Rivers remains secure. *Id.* at 22.

MMA states that reports of its "shaky" finances are false. *Id.* at 23. To that point, MMA emphasizes that it is "about to receive a $20.1 million cash infusion from the state of Maine." *Id.* at 23–24.

Finally, MMA asserts that Canadian National is improperly basing its irreparable harm argument on putative harm to Twin Rivers. *Id.* at 24; *MMA Post-*

*Hr'g Mem.* at 9. Citing First Circuit authority, MMA says that, "[a]s a matter of standing, CN may seek relief only for harms that it itself has suffered." *MMA Post-Hr'g Mem.* at 9. Thus, "[b]ecuase CN is itself suffering no irreparable harm, it lacks standing to seek this relief." *Id.*

### 3. Balance of Harms

According to MMA, Canadian National and Twin Rivers have prospered despite the lack of direct access, "CN carries 100% of TR's rail traffic; TR is shipping materials more cheaply than ever." *Id.* MMA says that, in contrast, an injunction would "harm MMA considerably, cementing in place the job losses (31 Mainers to date) and revenue losses ($5 million out of $32 million) that the transloading diversion has already precipitated. It would also create an operational nightmare." *Id.* (internal citation omitted).

MMA estimates that Canadian National is as much as 200 times larger than it is, and says that this disparity tilts the scale strongly in MMA's favor. *Def.'s Prelim. Inj. Opp'n* at 25. MMA calculates that, should Canadian National prevail, MMA will lose the entirety of Twin Rivers' business, which amounts to 10% of its total annual revenue. *Id.* MMA says that, in contrast, "a denial of any injunction . . . would do almost nothing" to Canadian National. *Id.* at 26.

### 4. Public Policy

MMA argues that "[o]usting [it] from its own track is not in the public interest." *MMA Post-Hr'g Mem.* at 10. It asserts that the public also has an

interest in MMA's financial wellbeing, and says that an injunction would further jeopardize competition for rail traffic. *Id.*

## III. DISCUSSION

### A. Arbitration

MMA cites significant case law proving Maine's "broad presumption in favor of arbitration," and explaining that under 9 U.S.C. § 2, "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable." *MMA Arbitration Mot.* at 2–3 (quoting *Barrett v. McDonald Invs., Inc.*, 2005 ME 43, ¶ 15, 870 A.2d 146, 149). However, these policy arguments become relevant only when an arbitration clause is applicable. The Court must first determine whether the parties' dispute is covered by an arbitration clause.

At its core, MMA's motion for arbitration presents a question of contract interpretation, requiring the Court to consider whether Article 20 of the TRA—the arbitration provision—is incorporated by reference into the Easement. *See Barrett*, 2005 ME 43, ¶ 17, 870 A.2d at 150 ("In interpreting the language of an arbitration agreement to determine substantive arbitrability, . . . we apply general principles of contract interpretation."). Both Canadian National and MMA have staked out positions on the furthermost boundaries of this issue: Canadian National asserts that the TRA is not in any respect incorporated by reference by the Easement (rather, it is only referred to), and MMA asserts that the TRA is incorporated in

whole. The legal reality lies somewhere in between. The TRA is incorporated by reference into the Easement. The crucial determination is how much.

A brief review of contract law is in order. "[T]he paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in light of all the circumstances under which it was made." *SC Testing Tech., Inc. v. Dep't of Envtl. Prot.*, 688 A.2d 421, 424 (Me. 1996) (quoting *Lynch v. Ouellette*, 570 A.2d 948, 949 (Me. 1996)). "An interpretation that would render any particular provision in the contract meaningless should be avoided." *Crowe v. Bolduc*, 334 F.3d 124, 135 (1st Cir. 2003) (quoting *McCarthy v. U.S.I. Corp.*, 678 A.2d 48, 52 (Me. 1996)). Furthermore, it is hornbook law that contracting parties may incorporate additional terms by reference to a separate document, in whole or in part. *See* 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:25 (4th ed. 2010) (WILLISTON). "Where a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument." *Id. See, e.g.*, *SC Testing Tech., Inc.*, 688 A.2d at 424 1996) (affirming a lower court's ruling that a contract incorporated by reference those parts of a Request for Proposal that did not conflict with a rider to the contract).

The relevant portion of the Easement grants Canadian National:

A perpetual, non-exclusive EASEMENT for the use and benefit of Grantee, its successors and assigns, for the uses and purposes defined and described in that certain Trackage Rights Agreement dated March 14, 2001 by and between Grantor and Canadian National Railway Company ("CN") (the "Trackage Rights Agreement"), over, upon and

across the premises described in Exhibit A attached hereto and Incorporated herein by reference (the "Easement Area"), situated in the County of Aroostook, State of Maine.

. . .

Grantee, for itself, its licensees, successors and assigns, shall have the right to make every use of the Easement Area for Grantee's purposes in accordance with the terms and provisions of the Trackage Rights Agreement. Grantee shall have the right to assign the operating rights hereunder to CN or any subsidiary of CN, to operate over the Easement Area in accordance with the Trackage Rights Agreement.

*Easement* at 1. Article 20, subsection (a) of the TRA, which MMA asserts is incorporated via the Easement's reference to the TRA, provides:

Any irreconcilable dispute between the parties with respect to this Agreement shall be resolved by submitting it to arbitration pursuant to the provisions of this Article. The decision of the arbitrators shall be final and conclusive upon the parties hereto.

*TRA* at 15.

By its plain language, the Easement's reference to the TRA is limited, defining the scope of the "uses and purposes" for which Canadian National could put the easement. The Easement did not incorporate the entirety of the TRA, only the portion delineating what activities were permissible under the Easement; the Court concludes that at most these include those provisions encompassed by the TRA's Article 1 (Grant of Trackage Rights), Article 2 (Use of Subject Trackage), Article 3 (Restrictions on Use), and Article 4 (Miscellaneous Special Provisions). Limited incorporation is a well-settled principle of contract law. *See Am. Lease Ins. Agency Corp. v. Balboa Capital Corp.*, 579 F.3d 34, 41 (1st Cir. 2009) (quoting *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277 (1916), for the proposition that "[t]he well settled rule is that 'a reference by the contracting

parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified'"); WILLISTON § 30:25 ("[W]here incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for such purpose only, and should be treated as irrelevant for all other purposes."). Thus, in *SC Testing Technology,* the Maine Supreme Judicial Court affirmed a lower court's ruling that a contract incorporated by reference only those parts of a Request for Proposal that did not conflict with a rider to the contract. SC Testing Technologies, Inc. (SCI) had previously sued the Department of Environmental Protection (DEP) for contract damages stemming from Congressional repeal of a vehicle emissions testing regime that SCI had run under a contract with the DEP. *SC Testing Tech., Inc.*, 688 A.2d at 422–23. The DEP argued, and the trial court agreed, that section 5.N of a Request for Proposal submitted by SCI placed the risk of Congressional repeal on SCI, and that this section had been incorporated by reference by the contract's Rider A. *Id.* at 424. The Maine Supreme Judicial Court agreed, stating:

> We agree with the trial court that the conflicts clause contained in Rider A expresses *a clear intention on the part of SCI and the DEP to incorporate into their agreement those provisions of the amended RFP that were not addressed in Rider A and that did not conflict with it.* Otherwise, the parties' reference to the amended RFP in the conflicts clause would be meaningless. In construing a contract, we should avoid an interpretation that renders meaningless any particular provision in the contract.

*Id.* (emphasis added).

Of course, even if Article 20 is not incorporated into the Easement, if armed with sufficiently broad language, it could nonetheless mandate arbitration in

disputes falling under the Easement. However, Article 20's language shows this is not the case. The Easement and the TRA are distinct agreements with different purposes and terms and executed separately. *See Yocum Tr.* 40:10–41:24 ("They're different agreements. . . . They're different details."). Article 20's explicit reference to "dispute between the parties with respect to *this* Agreement" eliminates its application to disputes falling under other agreements, including the Easement.

Having concluded that the arbitration clause is inapplicable to disputes under the Easement, the Court does not reach whether the relief requested by Canadian National is outside the arbitrators' jurisdiction.

## B. Preliminary Injunction Standard

A motion for preliminary injunction is assessed in light of the familiar four-factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Iantosca v. Step Plan Servs., Inc.*, 604 F.3d 24, 29 (1st Cir. 2010); *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006); *Ros-Simons of Warwaick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). "The burden on the moving party "is a heavy one: Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *L.L. Bean, Inc. v. Bank of Am.*, 630 F. Supp. 2d 83, 86 (D. Me. 2009) (internal quotation marks omitted). Both parties—moving and opposing—must "present evidence that goes beyond the unverified

allegations of the pleadings." *Kelly Servs., Inc. v. Greene*, 535 F. Supp. 2d 180, 182 n.1 (D. Me. 2008) (internal quotations and brackets omitted).

## C.     Likelihood of Success

"The sine qua non of [the] four-part [preliminary injunction] inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Esso Standard Oil Co.*, 445 F.3d at 18; *accord Ansys, Inc. v. Computational Dynamics N. Am., Ltd.*, 595 F.3d 75, 78 (1st Cir. 2010) ("The first factor, likelihood of success, is usually given particularly heavy weight.").   In assessing this factor, the Court considers, first, the likelihood of Canadian National showing by clear and convincing evidence that there was a mutual mistake such that the Easement should be reformed to reflect the parties' alleged intent of granting direct access to the mill.   Second, the Court considers whether Canadian National is likely to prove that access to the subject trackage would allow it to service the mill, either because switching is not required to serve the mill or because switching is allowed under the contract.

### 1.     Access to the Subject Trackage:  The Preclusive Effect of the First Circuit's Ruling

Canadian National asserts that, by application of the doctrine of claim preclusion,[8] the First Circuit's holding in *Howard v. Surface Transportation*

---

[8] Canadian National uses "res judicata" and "claim preclusion" interchangeably.  To avoid confusion, it bears noting that that term "res judicata" may mean only claim preclusion or claim preclusion and issue preclusion, together.  *Cruz Berrios v. Gonzalez-Rosario*, No. 08-2458, 2010 WL 5116617, at *2 n.5 (1st Cir. Dec. 16, 2010) ("Depending on the speaker's intention, the term 'res judicata' may refer either to the doctrine of claim preclusion specifically (coupled with 'collateral estoppel' as a synonym for issue preclusion) or else to the doctrines of claim and issue preclusion collectively").  The Supreme

*Board*—a case involving Canadian National and MMA's predecessor, BAR—

requires this Court to extend the easement to the Twin Rivers mill. Specifically,

Canadian National highlights the First Circuit's statements that:

> The Madawaska line runs *from the Fraser paper mill in Madawaska*,
> Maine, to an interchange with a CN line at St. Leonard, New
> Brunswick, Canada.
>
> . . .
>
> The parties also entered into a Trackage Rights Agreement. Under this
> agreement, CNR acquired limited local trackage rights which allowed
> it to run its own trains over the Madawaska line *to the Fraser paper
> mill*. Finally, in a third agreement BAR granted Waterloo a non-
> exclusive freight easement, under which Waterloo could also operate
> its trains over the line.

*CN Pre-Trial Mem.* at 4 (quoting *Howard*, 389 F.3d at 261–62) (emphasis added).

Canadian National lists the criteria necessary for invocation of the claim preclusion

doctrine, and concludes that "[a]ll of these criteria are met." *Id.* at 3. The Court

disagrees.

As a preliminary matter, the Court is not convinced that claim preclusion is

the appropriate doctrine here. Issue, not claim preclusion appears more clearly

applicable. The First Circuit has described the difference: "*Res judicata*, in its claim

preclusion aspect, is intended to prevent the re-litigation of claims already litigated

or that should have been litigated in an earlier action; in its issue preclusion aspect,

it prevents (with qualifications) re-litigation of issues earlier decided even if the

subsequent case involves a different claim." *Iantosca*, 604 F.3d at 30. The claim in

---

Court favors the latter usage, viewing "res judicata" as an umbrella term. *Taylor v. Sturgell*, 533
U.S. 880, 892 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue
preclusion, which are collectively referred to as 'res judicata.'").

*Howard* is not the claim before this Court; the *Howard* Court addressed a question of statutory interpretation not presented here. 389 F.3d at 260.

The Court admires Canadian National's decision to frame the issue as one of claim, not issue preclusion as a prescient strategic choice. But the Court is not bound by Canadian National's attempt to define the issue in its favor. The more natural theoretical fit for Canadian National's argument is that the *Howard* Court addressed and resolved an issue, not a claim, that was fairly litigated and that MMA should not therefore be allowed to re-litigate an issue it earlier lost, a proposition that describes the issue preclusion doctrine. The problem for Canadian National is, as the Court suspects Canadian National knows, that issue preclusion requires actual litigation on the precluded issue, *Gonzalez-Pina v. Rodriquez*, 407 F.3d 425, 429 (1st Cir. 2005), a requirement that is not mandatory in claim preclusion. *Id.* If Canadian National's *res judicata* claim is properly deemed one of issue preclusion, it must fail because *Howard* was decided on a motion to dismiss and never actually litigated the scope of the Easement.

Turning to *Howard*, the Court is not convinced that the First Circuit's language is binding on the parties and that, even if it were binding, the language is dispositive of the issues now before the Court. Although Canadian National presents the language in the appellate court's opinion as a factual finding, it is not. As an appellate court, the First Circuit rarely makes factual findings. *See, Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) ("If the Court of Appeals believed that the District Court had failed to make findings of fact essential to a

proper resolution of the legal question, it should have remanded to the District Court to make those findings. If it was of the view that the findings of the District Court were 'clearly erroneous' within the meaning of Rule 52(a), it could have set them aside on that basis. If it believed that the District Court's factual findings were unassailable, but that the proper rule of law was misapplied to those findings, it could have reversed the District Court's judgment. But it should not simply have made factual findings on its own"); *Anderson v. Bessemer City*, 470 U,S. 564, 574–75 (1985) ("The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources"); *United States v. Falu-Gonzalez*, 205 F.3d 436, 440 (1st Cir. 2000) ("It is a general principle of appellate jurisprudence that a party desiring more particularized findings at the trial court level must request them from the trial court" (quoting *United States v. Tosca*, 18 F.3d 1352, 1355 (6th Cir. 1994))). *In* Howard, the First Circuit describes the factual background to provide context for its legal rulings, not to make binding findings of fact. *See, e.g., Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 416 (1977) (describing the Sixth Circuit's factual consideration as "in a purely descriptive vein: no findings of fact made by the District Court were reversed as

having been clearly erroneous, and the Court of Appeals engaged in no factfinding of its own based on evidence adduced before the District Court").

If the lower court had made express factual findings, Canadian National could at least have argued they were binding. *But see In re Light Cigarettes Mktg. Sales Practices Litig.*, 691 F. Supp. 2d 239, 249–50 (D. Me. 2010) (rejecting a claim of issue preclusion). But the lower court made no factual findings. The magistrate judge ruled on a motion to dismiss and accepted as true the factual allegations in the BAR's Complaint against Canadian National. *Howard v. Canadian Nat'l Ry. Co.*, 03-63-P-S, 2003 U.S. Dist. LEXIS 17926, at *3 (D. Me. Oct. 8, 2003) *aff'd* 2003 U.S. Dist. LEXIS 23959 (D. Me. Nov. 18, 2003). The Court cannot conclude, therefore, that the parties ever actually litigated or that the district or appellate court ever actually ruled on the issue of the easement's geographic terminus. The Court concludes that issue preclusion is the doctrine that more accurately describes Canadian National's contention about the preclusive effect of *Howard* and under the issue preclusion doctrine, Canadian National's *Howard* argument clearly fails.

Nevertheless, to complete the analysis, the Court will address Canadian National's *Howard* claim to determine whether the doctrine of claim preclusion applies. "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Taylor v. Sturgell*, 533 U.S. 880, 892 (2008) (quoting *New Hampshire* v. *Maine*, 532 U.S. 742, 748 (2001)). Claim prelusion applies where:

(1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related.

*Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010).

The first[9] and third factors are satisfied, but the second is not. The First Circuit employs a transactional test for whether the previously and currently asserted causes of action are sufficiently identical or related. Under this test, the Court considers "whether the causes of action arise out of a common nucleus of operative facts." *Id.* at 15 (quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar. Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998)). A cause of action includes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id.* (quoting *United States v. Cunan*, 156 F.3d 110, 114 (1st Cir. 1998)). The Court analyzes "whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether treating them as a unit conforms to the parties' expectations." *Id.* (quoting *In re Iannochino*, 242 F.3d 36, 46 (1st Cir. 2001)) (internal quotation marks omitted).

Armed with these considerations, the Court cannot say that the causes of action are sufficiently identical or related to justify application of claim preclusion. In *Howard*, the First Circuit considered whether BAR[10] could, through federal

---

[9] *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981) ("The dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits'").

[10] BAR was represented by its bankruptcy trustee, Howard—the nominative plaintiff in suit.

bankruptcy proceedings, abandon the Madawaska line, and Canadian National's easement along with it. The case turned on a question of statutory interpretation:

> whether the term "abandonment" in section 1170 of the Bankruptcy Code gives the bankruptcy courts the power to adversely abandon a non-debtor railroad's easement and trackage rights over rail lines owned by the debtor at the time of the bankruptcy.

389 F.3d at 260. The First Circuit affirmed the district court's conclusion that the bankruptcy court did not have the power to approve abandonment of the line, and that Count III of BAR's bankruptcy suit against Canadian National should be dismissed.

There is nothing in the opinion to indicate that the First Circuit ever considered the precise boundaries of the easement. This makes sense; the specific limits of the easement would not have mattered to BAR since it sought abandonment of the entire Madawaska line; whether or not the line included several hundred additional yards from Milepost 0.0 to the mill would have been immaterial. This is especially so since, if BAR had been successful in abandoning the Madawaska line, those several hundred yards of track would have been a useless dead-end, extending from the mill to nowhere. While the First Circuit's ruling assuredly concerned the Easement and TRO, all that mattered was their existence, not their precise terms. Against this backdrop, the First Circuit's statements that the Madawaska line ran "to the Fraser [now Twin Rivers] paper mill" should be viewed only as factual background and not imbued with any sort of geographical precision.

This Court's consideration of the scope of the Easement is, therefore, not bound by the First Circuit's statements in *Howard*.

## 2.     Access to the Subject Trackage:  Mutual Mistake

The core issue is whether the Plaintiffs can show that reformation of the Easement is justified—that is, that there was a mutual mistake in the Easement and TRA's reference to Milepost 0.0 and both parties actually meant the easement to terminate at the loading docks of the mill.   Canadian National argues, essentially, that an agreement giving it access only to Milepost 0.0 would have made no financial or logical sense.   MMA responds that granting Canadian National access to Milepost 0.0 made eminent financial sense for Canadian National and granting Canadian National access beyond Milepost 0.0 would have made no logistical sense for BAR.

"Reformation is an equitable remedy by which an instrument may be corrected when a mistake is discovered so as to reflect the real intention of the parties."   *Jordan v. Shea*, 791 A.2d 116, 122 (Me. 2002).   The party seeking reformation shoulders the burden of proving, by clear and convincing evidence, the existence of a mutual mistake justifying reformation.   *Yaffie v. Lawyers Title Ins. Corp.*, 710 A.2d 886, 888 (Me. 1998); *Day v. McEwen*, 385 A.2d 790, 794–95 (Me. 1978).   A mutual mistake is one "reciprocal and common to both parties, where each alike labors under the misconception in respect to the terms of the written instrument."   *Yaffie*, 710 A.2d at 888 (quoting *Bryan v. Breyer,* 665 A.2d 1020, 1022 (Me.1995)); *accord Interstate Indus. Uniform Rental Service, Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 918 (Me. 1976) ("[T]he minds of the parties must fall prey to the

same misconception with respect to the bargain."). The mistake must be material to the transaction. *Yaffie*, 710 A.2d at 888. That is, it must "touch the subject matter of the bargain and not merely be collateral to it." *Id.*; *Interstate Indus. Uniform Rental Service, Inc.*, 355 A.2d at 918.

Canadian National's burden at this stage is mixed. Under the classic formulation for a preliminary injunction, Canadian National has the burden to demonstrate a likelihood of success on the merits. *Iantosca*, 604 F.3d at 29. But under the classic formulation for proof of a mutual mistake, Canadian National bears the burden of proving mutual mistake by clear and convincing evidence. *Yaffie*, 710 A.2d at 888. In *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372 (Fed. Cir. 2009), the Federal Circuit clarified that in addressing a motion for preliminary injunction involving a cause of action with a clear and convincing standard of proof, the trial court should determine whether it is more likely than not that the movant will be able to prove the case by clear and convincing evidence. *Id.* at 1379–80. *See also Banjo Buddies, Inc. v. Renosky*, 160 F. Supp. 2d 138, 144 (D. Me. 2001).

As both Plaintiffs and MMA rely significantly upon the Easement and TRA for support, the Court begins its analysis there. *See Barron v. Boynton*, 137 Me. 69, 71–72, 15 A.2d 191, 193 (1940) ("When there is a patent ambiguity in the instrument, it is competent for the Court to determine from the paper itself, in the light of the circumstances in which it was given, what was the actual intention of the parties"). The Easement incorporates by reference two statements that relate to

the property interest conveyed. First, Exhibit A describes the conveyed real property as:

> A portion of the line of railroad known as the Van Buren Branch of the Bangor and Aroostook Railroad, all in the State of Maine, extending from a point of connection with the Main Line in Madawaska (Milepost 264.13, Milepost V0.0), and running . . . to Van Buren (Milepost V24.1), all in the County of Aroostook, a distance of about 24 miles . . .

*Easement* at 8. Second, as regards the Easement's "uses and purposes," it incorporates two clauses in the TRA. *Id.* Article 1, entitled "GRANT OF TRACKAGE RIGHTS," provides in part:

> Subject to the terms and conditions herein provided, BAR hereby grants to CN the right to operate its trains, Locomotives, cars and equipment with its own crews (hereinafter referred to as the "Trackage Rights") over the following segments of BAR's railroad . . . :
>
> Between Milepost (MP) 0.0 Madawaska, ME to MP 22.72 Canadian Junction, thence over the line of railroad owned by the Van Buren Bridge Company and operated by BAR, from Milepost 0.0 (Canadian Junction) to the point of convergence with CN, located at MP 194.1 (approximately) of CN's Napadogan subdivision, near St. Leonard, NB a total distance of approximately 25.1 miles.

*TRA* at 2. Article 2, entitled "USE OF SUBJECT TRACKAGE," provides in part:

> (a) CN shall have the right to enter and exit the Subject Trackage only at the connections MP 0.70 at St. Leonard, NB and at MP 0.0, Madawaska subdivision, Madawaska, ME, *for the receipt or delivery of local traffic from and to the Fraser / Nexfor facility located in Madawaska, ME.* CN shall also have the right of onward movement to Van Buren as may be required exclusively for operating purposes to turn trains.

*Id.* (emphasis added).

The parties' arguments as to the parties' intent, distilled to their most basic, require this Court to consider whether the explicit reference to "Milepost 0.0" in Exhibit A and the TRA is entirely unambiguous and means what it says—as is

argued by MMA—or, as argued by Canadian National, reflects a mutual mistake by the parties, who meant to extend the easement all the way through the railroad yard to the mill doors, as might be inferred from the highlighted portions of Article 2 of the TRA.

### a.    Mistake by Canadian National

The Court is highly skeptical about Canadian National's claim that it never intended to agree to Milepost 0.0 in the three documents it signed.  First, despite Myles Tobin's recollection that the agreements were entered into hastily, there is nothing else on the face of any of the agreements that suggests ill-considered or sloppy work.  There are three, not one, agreements; the agreements cover the legal requirements for an interest in the land plus careful definitions of transferred rights; and, "Milepost 0.0" appears in each agreement.  Second, Canadian National has suggested no other inaccuracies in any of the documents.[11]  Third, Canadian National was paying a significant amount of money—$5 million—for the rights in these documents, which makes a mistake of this order less likely.  Fourth, the Milepost marker 0.0 is not an arbitrary location in the middle of the woods, as Canadian National has intimated.  It is a logical drop-off point for Canadian National trains to be switched by BAR into the mill yard.  Fifth, the $5 million dollar figure is not, as Canadian National has claimed, an exorbitant amount for an illusory right.  The $5 million allowed Canadian National to change from the

---

[11] Mr. Tobin explained that the contracts were negotiated in "a little less than two months from start to finish," and that this was "lightening speed," as compared to Canadian National's usual practice. *Tobin Tr.* 6:6-15, 10:1-5.  He further characterized the negotiations as "a bang-bang transaction that everybody was kind of all hands on deck to get done."  *Tobin Tr.* 24:18-19.  Perhaps, but the detail and comprehensiveness of the three agreements suggest otherwise.

division to a haulage system, effectively elbowing MMA from its preferred position as lead negotiator with Twin Rivers. This money was well spent; it not only gave Canadian National the right to subordinate MMA's negotiating position to its own, but it also gave Canadian National direct access to decision-makers at Twin Rivers, access that helps explain Canadian National's and Twin River's coordination of this lawsuit. Sixth, although BAR and Canadian National carefully worked out a Trackage Rights Agreement and the JSA, there is no switching agreement for Canadian National's entry into BAR's yard. From the Court's viewpoint, having heard the testimony of the railroad experts, it is highly unlikely that a railroad would transfer switching rights in its yard without a switching agreement.

The Court does not entirely discount Myles Tobin's recollection that there must have been a mistake by Canadian National. Mr. Tobin, the vice president of United State legal affairs for Canadian National when the contracts were executed, explained the TRA was intended to provide direct physical access by Canadian National to Twin Rivers in the event that the commercial access secured by the JSA proved inadequate—either because BAR's went out of business or because BAR's service was unsatisfactory. *Test. of Myles Tobin* 16:19–25, 17:25–18:12, 19:15–20 (Docket # 98) (*Tobin Tr.*). Mr. Tobin assigned a man named Chris Rooney, who did not testify, the responsibility of determining the milepost to secure direct access and at which the easement was to end. *Id.* 23:14–16, 32:2–7. Mr. Rooney apparently reported to Mr. Tobin that Milepost 0.0 was this location, and Mr. Tobin relied on Mr. Rooney's representation in negotiating the geographic point of the Easement.

Mr. Tobin concluded that "if milepost 0.0 does not permit that direct access because that's not where the Fraser Paper mill is located, then neither [he nor Mr. Rooney] intended that it would be milepost 0.0." *Id.* 35:11–14. Based on Mr. Tobin's testimony, Mr. Rooney made a mistake but in light of other evidence, it may have been Mr. Rooney who was correct and Mr. Tobin mistaken.

It is also true that Canadian National's expectations are further hinted by a letter Mr. Rooney and others from Canadian National drafted and sent to Robert Schmidt, then-president of BAR, during the negotiations. The letter, which was intended to confirm the parties' understandings, states that "BAR will grant CN an easement on [the Madawaska line] so that CN's right to reach Fraser–Madawaska would also be protected in an asset sale of [BAR]." Pls.' Ex. N at 1; *Tobin Tr.* 28:4–18. The contents of the Rooney letter, however, are not determinative because the phrase "right to reach Fraser-Madawaska" remains inherently ambiguous.

On cross examination, MMA pressed Mr. Tobin on whether the Canadian National's interest was physical access or only commercial access, and whether Mr. Tobin might have conflated the two. Mr. Tobin could not recall whether the businesspeople directing Canadian National's side of the negotiations, including Cliff Carson and Dale Williams, ever specifically used the words "physical access." Nonetheless, he was adamant that the subtext of his conversations with the Canadian National businesspeople was that it was to secure direct physical access to the mill. *Tobin Tr.* 45:3–46:7.

Maybe so.  But if direct physical access to the mill was such a significant part of the agreements, it is baffling that there is no language whatsoever explicitly granting it.  Neither that phrase nor anything like it appears in any of the legal documents and instead, Canadian National would have the Court conclude that it relied exclusively on a reference (which turned out according to Canadian National to be erroneous) to a geographic mile marker in order secure a legal right essential to the agreements.  Having gained an impression that Mr. Tobin is an intelligent, careful and competent attorney, the Court cannot conclude that he would have approved a series of agreements with such a serious obvious omission.

In light of all the evidence, the Court cannot find on this record it is more likely than not Canadian National will be able to establish by clear and convincing evidence that Canadian National expected to obtain direct access via the Easement and then unwittingly agreed to access terminating at a point just short of the mill.

### b.     Mistake by MMA's:   MMA's Statements to the Bankruptcy Court

To complete the analysis, the Court readily concludes that even if Canadian National erred, it is even more unlikely that Canadian National will be able to prove that BAR erred as well.  Canadian National's strongest argument points to statements made by MMA and its representatives to the United States Bankruptcy Court and says that they reveal MMA/BAR's true understanding of the Easements. Throughout the bankruptcy, BAR through its trustee Mr. Howard, and joined by MMA, attempted to have the trackage rights set aside.  *Yocum Tr.* 56:8–19.  In Canadian National's estimation, MMA is seeking to have it both ways: for purposes

of having the Bankruptcy Court set aside the easement, proclaiming that the easement provides direct physical access to the Mill; and for purposes of this case, proclaiming that the easement provides access only to Milepost 0.0.

On April 15, 2003, Mr. Yocum, then vice chairman of MMA, *Id.* 55:24–56:1, submitted an affidavit to the Bankruptcy Court in which he compared BAR's actual revenue under the JSA to BAR's theoretical revenue if Canadian National exercised its rights under the TRA, which provides for a $100-per-car fee to be paid to BAR. Pls.' Ex. H at 6; *TRA* at 3. The theoretical revenue did not include any amount of revenue earned for switching costs. Pls.' Ex. H at 6. According to Canadian National, this omission demonstrates BAR's belief that, under the Easement and TRA, Canadian National could access the mill directly without requiring BAR/MMA to switch cars from Milepost 0.0 to the Mill. *CN Post-Hr'g Mem.* at 6. Confronted with this document during cross examination, Mr. Yocum testified that the calculation of switching fees "wasn't the focus of what we were doing." *Yocum Tr.* 60:17–22. Later in the same affidavit, Mr. Yocum declares that absent a favorable ruling by the Bankruptcy Court, Canadian National might "or will even further reduce [MMA's] revenue by exercising rights under the [TRA] to *provide direct service to Fraser*." Ex. H at 8 (emphasis added). Similarly, Mr. Burkhardt, then-Chairman of the Board of MMA, submitted an affidavit in which he stated that "CN is not obligated to use the Junction Agreement to access [Twin Rivers'] mill, and may use the Trackage Agreement and institute service with its own locomotives and cars, with an obligation to pay only $100 per car, loaded or empty." Pls.' Ex. 9 ¶ 8.

The Court does not find MMA/BAR's representations to the Bankruptcy Court controlling. First, MMA's witnesses proffered plausible explanations for the statements in the affidavits. Mr. Yocum explained that in his affidavit, he was referring to commercial access rather than physical access, and that his understanding of the Easement and TRA is that an easement to Milepost 0.0 provided commercial access to the Mill. *Yocum Tr.* 62:2–7, 63:9–14. Mr. Grindrod, meanwhile, disclaimed Mr. Burkhardt's affidavit as incorrect. *Grindrod Day 2 Tr.* 73:1–19.

Moreover, to the extent that the representations are helpful to the Plaintiffs' case, the assistance is slight; the Court cannot conclusively determine MMA/BAR's contractual intent in 2001 from inferences from MMA's and BAR's imprecision in its representations to the bankruptcy court approximately two years later. Furthermore, the failure of MMA/BAR to include revenue from switching Canadian National's cars does not outweigh the plain language of the TRA explicitly precluding Canadian National from switching.

### c. Mistake by MMA: MMA's Intent

On the question of MMA's intent in March 2001, MMA presented Frederic Yocum as a witness.[12] *Yocum Tr.* 16:3–12, 16:25–17:14, 19:10–16. At the time the agreements were signed, Mr. Yocum had final decision-making authority to consummate the transaction for BAR. *Id.* 19:17–20:6. Mr. Yocum explained that the "primary thrust [of the three agreements] was to give commercial access to [Canadian National] to Fraser Paper at Madawaska." *Id.* 21:15–18. Mr. Yocum

---

[12] Mr. Yocum, now retired, is still on MMA's board of directors. *Yocum Tr.* 55:10-23.

further testified that he signed the TRA with the understanding that "[i]t provided physical trackage rights by CN over the bridge and on the Van Buren subdivision to the end of that subdivision at milepost 0.0." *Id.* 21:21–22:4. At that point, Canadian National would "hand off the traffic to MMA." *Id.* 30:11–13.

Canadian National argues that it would have been illogical to pay $5 million and walk away with anything less than direct physical access to the mill. It reasons that termination of the easement at Milepost 0.0 would only succeed in shifting the metaphorical toll booth down the track rather than eliminating it completely. That is, MMA could raise their charge for switching trains from Milepost 0.0 to the mill and make up whatever revenue they lost from Canadian National's free travel over the Madawaska line to Milepost 0.0. Canadian National's point here is not unreasonable; Mr. Yocum testified on cross examination that MMA would charge a switching fee "to move cars past milepost 0.0 to the west into the mill." *Id.* 44:8–13. However, MMA says that its switching fees could not be raised without limit; because they were effectively capped by market forces,[13] "[s]ome negotiation may take place. Something will get agreed to. [And t]he fee will get paid to the MMA ultimately . . . ." *Id.* 45:1–9.

For its part, MMA says that the $5 million payment from Canadian National was not for an easement that left Canadian National stuck outside the mill, but for the entire bundle of agreements—the JSA, the TRA and the Easement. According to MMA, the true economic impact of the bundle of agreements, which justified the

---

[13] At some point, the fee would be so high as to discourage rail traffic altogether. *See Yocum Tr.* 44:14-25.

$5 million price tag, was that they secured Canadian National's ability to transition from a subordinate haulage relationship with Twin Rivers to a direct division relationship.  Moreover, Mr. Grindrod estimated that by the terms of the JSA, over the course of five years, Canadian National may have seen as much as a $15 million return from its $5 million outlay.  *Grindrod Day 2 Tr.* 39:14–42:5.

Furthermore, responding to Canadian National's assertion that the purpose of the Easement was insurance against the BAR's dissolution, Mr. Yocum, maintained that at the time of the agreement "it was almost inconceivable that this particular railroad would not provide service to this particular customer in any kind of exigency, even . . . bankruptcy." *Yocum Tr.* 49:21–50:18.  He conceded, however, that some people shared Canadian National's concern. *Id.* 49:21–50:18.  Twin Rivers and Canadian National counter that, in the event of a bankruptcy where MMA was unable to service the mill, without direct access Canadian National would have had to make an emergency petition to the STB to request access beyond Milepost 0.0. *Test. of Brian R. Sass* 22:9–18 (Docket # 102) (Sass *Tr.*).  It argues that an agreement that required such action would have been illogical as it would have involved "the inherent delay in having to seek emergency authority from the STB." Ex. 110, ¶ 15 (*Sass 10/29/10 Aff.*).

### d. Mistake by MMA:  Switching at the Mill or at Milepost 0.0

What is most apparent is that whether the Court accepts MMA's argument that the easement terminates at Milepost 0.0, or Canadian National's argument that the Easement should be reformed to terminate at the mill, a gaping hole exists

in the contracts.  That is, termination of the easement at Milepost 0.0 highlights the contractual silence on the hand-off of cars between Canadian National and MMA. *See Tobin Tr.* 34:34:7–14 ("Q  Now, if CN's trackage rights were to stop at a point short of … the mill . . . you'd need some further agreement to get cars from that point into the mill; is that correct?  A Yes").  Conversely, termination of the easement at the mill highlights the contractual silence on how Canadian National and MMA are to share the switching yard.  *See Yocum Tr.* 22:12–23:1 ("[The TRA is] not a switching agreement.  There's no switching provision in it.  It allowed CN to go to milepost 0.0.  That's not where the mill is.  There are things that need to be done for the mill to be switched and served").  In either case, the three agreements left important details unresolved and there remains an irreducible ambiguity.

Nevertheless, in the end, the answer to the legal question seems clear.  The preliminary injunction hearing made apparent the enormity of the cooperation necessary for two railroads to share a switching yard as busy and compact as the one at Twin Rivers.  While the handoff at Milepost 0.0 assuredly involves some communication and coordination, it reaches nowhere near the levels required to share the switching yard.  Put simply: the logistical gap maintained by declining to reform the contract is several orders of magnitude smaller than the gap that would be created by reformation.

MMA does not use its switching yard to service only Twin Rivers.  Mr. Grindrod testified:

> This is the yard . . . where we manage the operations on the northern portion of the railway. . . . [W]e run trains in here from Millinocket

that bring goods up to several other customers and to the interchange with the Canadian National at St. Leonard, which is just across the bridge from Van Buren. We have several other customers up here, and in addition to that . . . we serve Twin Rivers from this facility.

*Grindrod Day 1 Tr.* 10:13–20.  Mr. Grindrod explained that the activity in the yard exceeded its small size, characterizing it as "5 pounds in a 2-pound bag."[14]  *Id.* 11:13–17.

Furthermore, Canadian National's use of the switching yard would be substantial and invasive.  Mr. Grindrod estimated that servicing Twin Rivers consumed forty to fifty percent of the yard, *Id.* 15:5–8, and Mr. Rosner explained that the process would take six to eight hours to complete, *Test. of Mark Rosner* 40:17–21 (Docket # 105) (*Rosner Tr.*).  Mr. Dutton testified that Twin Rivers desires such services six days per week.  *Dutton Tr.* 8:23–9:3.  This activity would have to be performed all while "maintain[ing] sufficient room and sufficient track capacity to handle the throughput of the yard that is neither going to or coming from Twin Rivers." *Grindrod Day 1 Tr.* 15:21–24.  Mr. Yocum testified that allowing Canadian National activity in the yard would "bring about a lot of complexity":

Q Can you describe that complexity?

A Well, you'd have two . . . railroads operating in the area. The yard is not just the service yard for Twin Rivers.  It's also a yard that has other kinds of commodities for other shippers and receivers.  It looks on paper like it's a fairly easy, flat situation, but you'll notice that Bridge Street runs right through it.  The tracks are small tracks and they're on various sides.  It's a . . . complicated, small place that you've got to . . . cram everything into.

---

[14] A possible further squeeze on the MMA railroad yard in Madawaska is the storage of empty cars, although Mr. Grindrod said that MMA would not normally do so because the "last thing you need in Madawaska yard, under ordinary circumstances, is extra cars."  *Grindrod Day1 Tr.* 22:3-9.

> And with the way the sale to the state is lined up, there would also be a third party using the main track. The short-line operator has trackage rights through there. So it'd be a very complex situation that would require a lot of coordination.

*Yocum Tr.* 32:9–23. Thus, it is not the case that Canadian National could unobtrusively shuttle cars to and from Twin Rivers' docking facilities. Its presence would create a significant and ongoing obstacle to MMA's efficient use of the yard and would require constant interaction with and coordination by MMA. Furthermore, the complexity caused by MMA and Canadian National sharing the switching yard cannot be alleviated by Twin Rivers' assistance since it cannot coordinate MMA's and Canadian National's switching operations, *see* Pls.' Ex. 72 at 4 ("Twin Rivers Paper cannot manage 2 different car fleets and the required directional loading: i.e. if MMA and CN operating at same time: MMA cars routed MMA routes and CN cars routed CN routes"), and Mr. Rosner could think of no instances where two railroads shared a switching yard with each railroad performing its own switching, *Rosner Tr.* 42:2–10.

On cross examination, Mr. Grindrod acknowledged that the congestion created by Canadian National's shipment of Twin Rivers paper would not be an issue so long as the congestion were no more significant than the congestion created by MMA's shipment of Twin Rivers paper. *Grindrod Day 2 Tr.* 76:23–77:2. Nonetheless, the concern is not the total volume of traffic in the switching yard, but the degree of coordination, communication, and management necessary to safely allow two railroads to share one small switching yard. As Mr. Grindrod stated, Canadian National's presence would "increase the risk of accidents," which is

otherwise "substantially reduced when you have all the parties under your direct control and know what is going on at all times." *Id.* 77:14–25.

In contrast, the hand-off of cars at Milepost 0.0 can be done sequentially, and does not require the simultaneous presence and attention of Canadian National and MMA. There are only two tracks involved—the main line and the "siding," *see* Pls.' Ex. 82—and there need not be any synchronized interaction between railroads; the cars can be left on the siding or the main track by the depositing railroad, and later retrieved by the receiving railroad. *See Yocum Tr.* 31:15–32:5. Furthermore, as explained by Messrs. Grindrod and Rosner, the geometry of the track at Milepost 0.0 allows for MMA and Canadian National to hand off cars without Canadian National encroaching onto MMA's property west of Milepost 0.0.[15] Twin Rivers typically delivered ten to twelve cars to MMA for switching. *Grindrod Day 2 Tr.* 32:5–15. Yet, the siding is large enough to accommodate Canadian National's deposit of up to a 47-car train, which would be "quite large" as measured by Twin Rivers' historical need. *Id.* 28:14–5. Moreover, the main line portion between Milepost 0.0 and its western-most intersection with the siding is large enough to accommodate the deposit of a 140-car train, which would be by history "immense." *Id.* 31:9–32:4.

---

[15] Mr. Grindrod explained that, when Canadian National wished to transfer a line of cars to MMA, it could engage in a process known as a "runaround," whereby Canadian National would deposit a line of cars on the main line, decouple its engine, pull west past the intersection of the main line and siding, throw a switch, and then return east to St. Leonard, bypassing the line of cars via the siding—all without encroaching onto MMA property west of Milepost 0.0. *Grindrod Day 2 Tr.* 24:9-25:6. In turn, MMA could hand a line of cars to Canadian National simply by pushing the cars east down the main line, decouple the engine, and return west to the mill, and Canadian National would then attach its engine to the line of cars, and pull them east towards St. Leonard. *Id.* 29:16-30:8; *see also Rosner Tr.* 37:15-39:19.

None of this is to say that an exchange at 0.0 is without issue. As noted, neither the Easement nor the TRA provides for the manner of such an exchange and as Mr. Rosner acknowledged at cross examination, there are a number of issues left outstanding by the TRA and Easement including price and scheduling. *Rosner Tr.* 66:25–68:4. However, he was adamant that the outstanding issues involved in switching at Milepost 0.0 were relatively few. *Id.* 67:11–15. Furthermore, although the Easement and TRA are also silent as to any fee to be charged by MMA for hauling cars from Milepost 0.0 to the mill, this seems, in the scope of issues, to be a relatively minor one. *Grindrod Day 2 Tr.* 52:13–25. Mr. Grindrod explained that it is "common in the industry" for railroads to leave such issues open subject to further negotiation. *Id.* 52:13–19. All of this militates in favor of MMA's assertion that it never intended physical access to the mill.

Beyond the physical limitations of the switching yard, the text of the Easement and TRA also indicates that no direct access was intended. Specifically, the absence of any text in the Easement or TRA that would allow MMA and Canadian National to share the switching yard is strong evidence that MMA did not intend the easement to terminate at the mill. Mr. Rosner opined that, in order for two companies to switch in the same yard:

> There would have to be some form of agreement. . . . [A]ll the details would need to be spelled out. Who can operate where, on what tracks, at what time, . . . who would have priority, how would storage or . . . use of tracks be defined, how long could someone . . block the mainline or block sidings. There are just a whole bunch of issues that would require coordination.

*Rosner Tr*. 42:14–20. This echoes Mr. Yocum's assessment that a switching agreement "involves all of the aspects of getting empties in, getting loads out, getting loads in, getting empties out, and doing the various kinds of processing and switching that need to be done in order to do that." *Yocum Tr*. 23:21–24:1. It would require agreement on such details as yardmasters, train controls, fees, safety regulations and operating rules. *Id*. 25:19–26:4. None of these coordinating provisions is present in the TRA. *Rosner Tr*. 42:21–25. An injunction in Canadian National's favor would require the Court to confront all of these issues or else face— in Mr. Rosner's words—"congestion and confusion." *Id*. 43:1–4. Such an outcome counsels strongly in favor of MMA's argument that the termination of the easement at Milepost 0.0 was intentional—at least by BAR.

### e. Summary

The Court concludes that Canadian National has not sustained its burden to show that it will more likely than not succeed in demonstrating by clear and convincing evidence that MMA/BAR and it entered into the agreements by mutual mistake justifying reformation.

### 2. Switching Operations

Canadian National makes two arguments as regards the switching provision. First, it says that the activities it would perform in the switching yard would not violate the TRA's prohibition on "switching" because Canadian National would only be "spotting" and "pulling." Second, Canadian National argues that, even if switching were required to service the mill, it is allowed by virtue of the TRA's

Article 2(d) preamble, stating "Except as may otherwise be provided by this Agreement . . . ." Ex. E at 2; *Pl.'s Post-Trial Mem.* at 8.

The Court looks first to the language of the TRA. Most directly on point is Article 2(d):

> Except as may otherwise be provided by this Agreement, CN shall not use any part of the Subject Trackage for the purpose of switching, storage, or servicing cars or equipment, or the making or breaking up of trains, except that nothing contained herein shall, upon prior approval of BAR, preclude the emergency use by CN of such auxiliary tracks as may be designated by BAR for such purposes.

*TRA* at 2. Before addressing Canadian National's first argument, that its activities in the yard would not constitute "switching,"[16] the Court must first determine what is and what is not a "switching" under the TRA, a term the TRA leaves undefined. On this point, significant hearing testimony was devoted to the definition of and distinction between spotting, pulling and switching. Canadian National explained that spotting is the placement of a car in a particular location on a track. MMA's expert, Mr. Rosner, confirmed this definition of spotting as a "part of the switching process. So the cars would be spotted at the points within the customer facility that are typically designated by the customer . . . ." *Rosner Tr.* 25:22–26:8, 45:12–15. According to both Messrs. Yocum and Grindrod, spotting and pulling are the same as switching. *Yocum Tr.* 46:18–47:4; *Grindrod Day 1 Tr.* 23:21–25.

As regards switching, both Mr. Duquette for Canadian National and Mr. Yocum for MMA generally described it as moving cars from track to track to place

---

[16] The term "shunting" was also used frequently. Mr. Rosner explained that shunting is the same thing as switching: "it's a term in the Queen's English. In Australia, New Zealand, the UK, it's all referred to as shunting as opposed to switching." *Rosner Tr.* 44:21-45:5. The Court uses the term "switching."

them in a particular order. Mr. Rosner, meanwhile, provided a lengthy demonstrative of a switching operation that involved the placement of certain colored flags, application of "derails," connection of breaks, release of handbrakes, coupling and de-coupling of the engine from different railroad cars, coupling of new railroad cars from siding track to railroad cars left on the main line, safety stops, and marker attachment. *Rosner Tr.* 19:1–28:7. Mr. Rosner explained that switching is not spotting and pulling and summarized it, somewhat circularly, as "first and foremost, it's switching the train. It's switching the customer. It's also making up a train, and it's breaking up a train." *Id.* 28:18–24.

Confusion about the exact definitions of spotting, pulling and switching is understandable given the close relation among the terms, the fact that common railroad parlance allows some conflation, and different areas of the world use the terms slightly differently. The Court accepts that spotting and pulling are components of switching. The Court views the varying definitions of "switching" as effectively saying the same thing, but generally regards switching as a sequence of steps in which railroad cars are ordered or reordered, coupled together, and ultimately coupled to an engine. However, the Court need not resolve the precise contours of switching activities, nor decide whether spotting and pulling are synonyms for switching or are separate acts altogether. It is convinced that the actions that Canadian National seeks to perform fall within the definition of switching as suggested by both parties.

MMA rejects the notion that the mill may be serviced without switching. Mr. Yocum explained that the mill requires switching "[b]ecause it needs to have cars placed within the mill, and there isn't room to take a whole train and put it in, and the configuration of the tracks is such that the trains need to be broken up into smaller pieces, even independent of what the mill needs." *Yocum Tr.* 28:10–15, 46:18–47:4. Mr. Grindrod further explained that one reason switching would be required would be when a "bad" railroad car—a car suffering either a mechanical breakdown or lacking certain required documentation—had to be moved to allow other cars to be filled, and that this shuffling of bad cars for good could only happen via a switching operation.[17] *Grindrod Day 1 Tr.* 17:19–18:12, 19:9–24, 24:1–3.

Messrs. Yocum and Grindrod's affirmation that switching is a necessity is supported by Twin River's own witness, Mr. Sass, who explained:

> Switching does happen in the mill with the MMA when they will take a half car from one of my shipping departments and switch it to another part of the mill. They'll take a chemical car that's half empty and switch it to another part of the mill if I need that product. So switching does happen. Shunting, pulling, setting the mill happens, but I know the MMA does switch cars from one side of the mill to the other.

*Sass Tr.* 42:3–10, 43:16–18. Mr. Sass' testimony was confirmed by Twin Rivers' internal documentation, a *Compilation of comments from daily Shunt Verification business records of Fraser and Twin Rivers*, which was compiled from "the

---

[17] Mr. Grindrod acknowledged on cross examination that Twin Rivers might decide that it preferred Canadian National's service to MMA's, even at the consequence of not moving a bad car and those behind it. Grindrod *Day 2 Tr.* 78:23-79:15. While this may be logically true, the Court does not view such an event as likely; the evidence adduced at trial shows only three tracks leading into Twin River's "Bond" paper warehouse, *see* Pls.' Ex. 8, and the Court does not find it credible that Twin Rivers would allow the discovery of three bad cars (one on each track) to effectively shut down the entire warehouse.

foreman's log and/or the shunt verification forms," and listed numerous incidents of switching. *Id.* 39:22–25; Pls.' Ex. 135 at 8.

The Court is convinced that to service Twin River, Canadian National would be required to go beyond the minimally invasive operations of spotting and pulling. The evidence at the hearing shows that each day Twin Rivers requires ten to twelve-car trains to be assembled. Furthermore, the three tracks in Twin Rivers' bond warehouse can each fit no more than six cars per track. Pls.' Ex. 8. At a minimum, then, assembly of a ten to twelve-car train requires more than simply driving into the Twin Rivers facility, coupling to the nearest car, and pulling away. The deposit of empty cars and receipt of full cars in a single trip, or the occurrence of a "bad" car, would create significantly more complexity.[18] In short, Canadian National has not shown a likelihood of proving that the mill can be serviced without switching.

Moreover, even if the Court were to conclude that the activities that Canadian National must perform do not fall within the definition of switching, it would conclude that Canadian National must still engage in the making or breaking up trains[19]—also prohibited by the TRA. *TRA* at 2 ("Except as may otherwise be

---

[18] Although Mr. Grindrod acknowledge on cross examination that Twin Rivers might decide that it preferred Canadian National's service to MMA's, even at the consequence of not moving a bad car and those behind it, *Grindrod Day 2 Tr.* 78:23-79:15, the Court does not find it credible that Twin Rivers would allow the discovery of three bad cars (one on each track) to effectively shut down the entire warehouse.

[19] There was some testimony regarding the definition of a "train." Mr. Rosner, testified that, although he would consider a train to be a group of cars, "Under the extreme definition of train contained in the General Code of Operating Rules in the U.S., a train is . . . an engine, with or without cars, displaying a marker." *Rosner Tr.* 24:10-16. (A marker—also called a telemetry device or a TIBS—is a device that's put on the back of a train to provide the engineer with the location of the rear of the train and the status of the brake system at the rear of the train and also gives the

provided by this agreement, CN shall not use any part of the Subject Trackage for the purpose of . . . the making or breaking up of trains . . . ."). Mr. Rosner explained that the making up of trains "would be the cars being pulled out of the customer facilities as they were switched together form various tracks and coupled together and the brakes were hooked up. Once a marker was put on it, it officially became a train . . . ." *Rosner Tr.* 34:13–22. By way of example, he explained that the breaking up of trains would occur when an inbound train arrives and the locomotive is moved to the rear and the train was broken up into different pieces and placed on different tracks. *Id.* 34:8–12. The uncoupling of ten to twelve cars from a locomotive and placement on two or three of the tracks in Twin Rivers' bond warehouse or, conversely, the coupling of ten to twelve cars onto a locomotive meets Mr. Rosner's definition of making and breaking up trains, and would violate the TRA.

The Court turns to Canadian National's second argument: that, despite the TRA's apparent blanket ban on switching, it is nonetheless allowed by virtue of Canadian National's ability to directly service the Mill. According to Canadian National, this implicit allowance of switching comes by way of Article 2(d)'s preamble, which begins "Except as may otherwise be provided by this Agreement . . . ." *Pl.'s Post-Trial Mem.* at 8. The Plaintiffs spent significant time questioning MMA's witnesses as to whether the preamble to Section 2(d) of TRA implied that switching, storage, servicing cars or equipment, or making or breaking up trains,

---

engineer the ability to "put the train into emergency from the back of the train." *Rosner Tr.* 23:23-24:6.) The Court need not adopt any one definition of "train." By any measure, the activities that Twin Rivers requires would involve the making and breaking up of trains.

would be allowed once the Easement were reformed to provide for direct access. *Rosner Tr.* 48:12–51:6. However, the Court has already determined that Canadian National has not shown a likelihood of proving mutual mistake. Because the easement's termination at Milepost 0.0 stands, Article 2(d)'s qualification cannot be read to allow switching at the mill.

## B. Irreparable Injury

Canadian National and Twin Rivers face a "substantial" burden in demonstrating that the harm they face would be irreparable. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). Generally, the moving party satisfies the burden by proving inadequacy of legal remedies. *Id.* (citing *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982)). To this point, "economic harm in and of itself is not sufficient to constitute irreparable injury." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*. 839 F. Supp. 68, 70 (D. Me. 1993) (citations omitted). Yet, the moving party need not go so far as to "demonstrate that the denial of injunctive relief will be fatal to its business." *Ross-Simons of Warwick, Inc.*, 102 F.3d at 18. The moving party succeeds if it "suffers a substantial injury that is not accurately measurable or adequately compensable by money damages." *Id. at* 19. However, proof of a mere possibility of injury is insufficient to justify an injunction; the party "seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 375 (2008).

### 1. Irreparable Injury to Canadian National

Canadian National lists three instances of harm that it claims justifies a preliminary injunction: (1) interference with a property right; (2) loss of customer goodwill; and (3) MMA's inability to pay damages. As to the first, Canadian National cites the First Circuit case of *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989), to demonstrate that the First Circuit regards loss of a property interest an irreparable injury. *CN Prelim. Inj. Mot.* at 19. It is true that in *K-Mart*, the First Circuit wrote that "[r]eal estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor." *K-Mart Corp.*, 875 F.2d at 915. However, in *K-Mart*, the First Circuit addressed a claim of damages from the construction of three buildings at a shopping center that affected K-Mart's visibility to the public and violated the terms of the lease. *Id.* at 909–10. The First Circuit observed that the damages flowing from the loss of K-Mart's property interest, "[b]eyond goodwill, the loss of revenues resulting from considerations such as diminished visibility, restricted access, less commodious parking, and the like are sufficiently problematic as to defy precise dollar quantification." *Id.* at 915.

Here, the Court is not convinced that the damages to Canadian National from violation of the Easement could not be quantified. During his testimony, Mr. Dutton of Twin Rivers explained in detail what the mill had calculated it had spent in order to put into place the transloading agreement. Twin Rivers keeps accurate records of its paper production and the Court is not convinced that Canadian

National could not, if it wished to do so, arrive at a similar quantification of its asserted damages.

While assuming that the loss of a property interest in an easement might constitute irreparable harm, to issue an injunction still requires proof that Canadian National has a property interest that would be curtailed—specifically, that Canadian National is losing the benefit of its right to directly access the mill, and the Court cannot say that there is a likelihood of Canadian National proving that the Easement grants such a right of access.

As regards Canadian National's claim of imminent harm to customer goodwill, the evidence does not support such a threat. As Canadian National acknowledges, "Twin Rivers wants Canadian National's service; and Canadian National wants to provide it." *CN Supplemental Mem.* at 7. That Twin Rivers has intervened in this case to support Canadian National strongly suggests that Canadian National's relationship with Twin Rivers is secure. Although Mr. Dutton stated his indifference to which company provides rail service to Twin Rivers, *Dutton Tr.* 18:1–8, the Court is not convinced that its denial of the preliminary injunction will affect Twin Rivers' preference for Canadian National. Mr. Dutton and Mr. Sass, Twin River's Vice President of Operations, emphatically described a markedly poor relationship between Twin Rivers and MMA. Mr. Sass described the "rocky relationship" between Twin Rivers and MMA as stemming from erratic service, missed deliveries, and absent work crews. *Sass Tr.* 6:9–25. Mr. Dutton likewise characterized the relationship as "difficult," "expensive," and "contentious."

*Dutton Tr.* 7:8–10, 9:14–19. In fact, Mr. Dutton viewed his relationship with Mr. McGonigle, MMA's marketing manager, as "awful, unlike anything [he] had ever seen." *Id.* 35:17–24.

Despite the obvious acute dissatisfaction of one of its largest customers, MMA persists in viewing its service positively, and, while acknowledging that "[i]t's not perfect," attributes service issues to the difficulties in Madawaska's challenging winter environment. *Grindrod Day 2 Tr.* 13:18–14:7. Thus, indications are that Twin Rivers has become so dissatisfied with MMA it no longer wishes to do business with MMA and yet MMA does not even now fully recognize the depth of Twin Rivers' disappointment in its service.

Canadian National's final concern—"MMA's precarious financial condition"— is supported by the affidavit of Canadian National's Vice President of Sales and Marketing – Industrial Products, reciting statements purportedly made to the STB. When pressed the hearing, Canadian National refined its argument, asserting that the payment of *any* award—even one dollar—was beyond MMA's ability. In response, MMA offers the affidavit of its President and CEO, informing the Court that it expects to return to profitability when certain lines are sold to the state of Maine. After the hearing, MMA confirmed that it sold 233 miles of track to the state of Maine for $20.1 million dollars cash, which MMA was using to pay down debt. *Notice Regarding Completion of $20.1 Million Sale of Montreal, Me. & Atl. R.R. Line* (Docket # 112). The Court is doubtful that that MMA's financial state is as perilous as Canadian National alleges, especially after Maine's purchase of

MMA's track.  In any event, at best, these dueling affidavits remain in stalemate. As the burden lies with Canadian National, the Court finds in MMA's favor on this point.

### 2.    Irreparable Injury to Twin Rivers

As a purely legal matter, MMA challenges Canadian National's ability to assert harm to Twin Rivers as justification for a preliminary injunction.  According to MMA, "[a]s a matter of standing, CN may seek relief only for harms that it itself has suffered."  *MMA Post-Hr'g Mem.* at 9.  For a separate reason, the Court need not resolve whether a court may enjoin a party based upon irreparable harm to an intervenor; Twin Rivers' possible damages are quantifiable and cannot form the basis for claimed irreparable harm.  *See Brown v. Colegio de Abogados de P.R.*, 613 F.3d 44, 49 (1st Cir. 2010) (noting that "where it is clear that damages are easily determined, this may well counsel against injunctive relief"); *Frank Martin Sons, Inc. v. John Deere Constr. & Forestry Co.*, 542 F. Supp. 2d 101, 106 (D. Me. 2008) ("Based on the record, any potential loss that [the plaintiff] would sustain as a result of the termination of the franchise relationship is quantifiable, and does not qualify as irreparable harm").

Twin Rivers emphasizes that the status quo, as understood by MMA, forces Twin Rivers to absorb unsustainable shipping costs and to maintain its dysfunctional relationship with MMA.  Mr. Dutton explained that Twin River's costs with MMA were "extraordinarily high" and unreasonable and put Twin Rivers at a competitive disadvantage.  *Dutton Tr.* 10:8–22.  The paper industry is a

"delivered cost business," meaning that the paper manufactures, not the customers, pay the cost of shipment. Thus, increased shipping cost "comes right out of our margin, and we have to either try to find ways to mitigate it or try to find a way to make it up somewhere else." *Id.* 9:4–13. The benefit to Twin Rivers of shipping with Canadian National is apparent; Ms. Sass, declared by affidavit that Twin Rivers' agreement with Canadian National:

> 1) significantly reduced freight costs; 2) reduced transit time to Twin River's customers by approximately 5 days; 3) reduced working capital requirements of approximately $5 million; and 4) improved on-time delivery by an estimated 30%.

*Sass 10/29/10 Aff.* ¶ 11. He concluded that "the foregoing benefits from rail service by [Canadian National] are essential in order for Twin Rivers to remain competitive." Mr. Dutton likewise explained that by using Canadian National, Twin Rivers hoped to eventually ship eighty percent of its product by rail, thereby lowering Twin Rivers' costs. *Dutton Tr.* 12:20–13:23.

Twin Rivers also rejects the notion that either the transloading agreement or the Rule 11 rate that MMA quoted succeeds in alleviating the harm Twin Rivers' faces. According to Twin Rivers, the Rule 11 rate only maintains the unsustainably high shipping costs MMA charges and, in any event, Twin Rivers is doubtful that MMA can be relied on to continue to extend the rate. *Sass Tr.* 23:13–22. Furthermore, the transloading agreement, according to Mr. Sass, is not a long-term solution because "[t]he mill is set up to ship rail," *Id.* 20:22–21:11; *Sass 10/29/10 Aff.* ¶15. Mr. Sass says that the transloading agreement requires significant improvements to the Edmundston facility, and Twin Rivers has already absorbed

over $290 thousand in setup costs from November 15 to November 30, 2010, *Sass Tr.* 26:18–22, 28:7–9, 32:18–25, 36:4–10; Ex. 142A, and it expects to incur additional costs, including work on the roof and supporting beams and correcting problems with water in the train yard, *Sass Tr.* 34:15–24. Transloading also risks problems with border crossings if Homeland Security were to issue an alert shutting down the bridge linking Madawaska and Edmundston. *Id.* 35:4–14. In contrast, MMA views the transloading operation as a success and cites it as proof that neither Twin Rivers nor Canadian National risks irreparable injury. Unsurprisingly, Canadian National and Twin Rivers disagree.

Based on this record, Twin Rivers has not demonstrated irreparable harm. While reaffirming that the current situation was not sustainable, Twin Rivers acknowledged that the mill had not reached a financial tipping point, and could not give a date as to when that point might be reached. Furthermore, on direct examination, Mr. Sass acknowledged that, though the "best option for the mill is to have viable train service," and the transloading operation involves some risks and uncertainty, it could nonetheless be continued indefinitely. *Id.* 36:11–22. He repeated the same on cross examination:

> Q    You just testified that you thought that the transloading operation could continue for some period of time?
>
> A    Correct.
>
> Q    Do you think it could continue long enough for . . . CN and MMA to have an arbitration if Judge Woodcock is kind enough to send us there?
>
> A    I don't know how long that would take. I think it can continue as long as I need to service my customers in this manner.

*Id.* 37:22–38:5. He further admitted that "everything [Twin Rivers] need[s] to accomplish in terms of transportation is being accomplished by this combination of truck and rail," and that, as of the time of the hearing, all of the Twin Rivers' employees and suppliers were being paid and there had been no layoffs at the mill. *Id.* 61:8–18. ,

In fact, Twin Rivers' internal documents suggest the transloading operation was feasible, and could yield savings of as much $1,100 per car or $5 million over the next two years including startup costs. *Id.* 57:6–12; 66:17–67:5; *Dutton Tr.* 49:20–51:6; Ex. 31 at 1; Ex. 69 at 3. Twin Rivers' savings was apparently of such sufficient size and certainty that it planned to "announce a freight cost reduction to customers using trans load" and to mention the $1,586 of in savings over MMA's rates. Ex. 31 at 1; *Sass Tr.* 67:19–68:12.

At the same time, the transloading operation forced some initial costs. As Mr. Dutton explained:

> we had a condemned building we had to deal with [in Edmundston]. We had floor repairs we had to deal with. We had to put in doors; we had to put in lighting. We . . . had nobody in Edmundston . . . that had handled paper that we could use. So we to . . . had to pull folks over from the U.S. side to help train people who had never . . . loaded paper before . . . and it can be very, very easily damaged.

*Dutton Tr.* 21:20–22:10, 23:5–13. Twin Rivers estimated $315,000 in startup costs. *Sass Tr.* 57:6–12; Ex. 69 at 3. It also estimated that transloading to Edmundston would cost approximately $300 per truck, which included annuitized startup costs. *Id.* 58:9–16. Mr. Dutton further explained that there would be additional, non-transit costs associated with transloading such as "all of the extra employee costs,

the extra loading costs, the extra mobile equipment costs, the extra maintenance costs to maintain a facility that we weren't maintaining." *Dutton Tr.* 27:4–24. Mr. Dutton summarized the transloading option as a "horrible long-term solution for the mill." *Id.* 29:9–11.

However, Messrs Sass and Dutton admitted that many of the startup costs were actually ongoing expenses that would diminish over time as the operation matured. *Sass Tr.* 50:9–11, 50:15–51:10. For example, the rate of damaged paper would likely diminish as the Edmundston crew became more experienced. *Id.* 50:15–51:10. Mr. Dutton stated that he expected the transloading operation to eventually become less expensive than the Rule 11 rate MMA quoted. *Id.* 29:18–30:6.

Furthermore, Twin Rivers previously engaged in a trans-loading operation with MMA and there is no evidence that it suffered debilitating costs or damage to its paper. Mr. Grindrod explained that twenty-five percent of the rail traffic coming out of the mill via MMA was shipped to Logistics Management Services(LMS), a sister company of MMA that receives product by rail and then loads it onto trucks in order to reach customers who were not accessible by rail. *Grindrod Day 1 Tr.* 26:2–24; *Grindrod Day 2 Tr.* 7:15–8:8. The only significant difference between this operation and the transloading operation being performed by Canadian National is the sequence of events—goods sent to the LMS facility are sent first by rail then transloaded to trucks, while goods sent to the Edmundston facility are sent first by truck then transloaded to rail. *Grindrod Day 2 Tr.* 8:9–9:7.

In short, the Court regards Canadian National and Twin River's claims of harm as quantifiable, and not a basis for injunctive relief. The expense Twin Rivers incurred from retrofitting the Edmundston facility, the incremental damage to its product, the cost of transloading or the Rule 11 rate as compared to the rate Canadian National would charge for direct access, all can be reduced to dollars-and-cents. Moreover, the Court is not convinced that the other, non-quantifiable harm such as Twin Rivers' dissolution or Twin Rivers' loss of customers are likely. *See Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) ("Preliminary injunctions are strong medicine, and they should not issue merely to calm the imaginings of the movant"). The evidence indicates that, although less than ideal, the transloading operation remains feasible. Moreover, a significant amount of the up-front efforts and costs have already been absorbed; Twin Rivers has begun retrofitting its facility in Edmundston, has already moved personnel from Madawaska, and has begun shipping. The transloading operation has and will continue to pose a challenge to TR—at least until the kinks are worked out of the system—but it must balance those hardships with the hardships that MMA would face if it were forced to share an already cramped switching yard with another company not under its direct control.

Although the Court is sympathetic to Twin Rivers' desire to ship with Canadian National versus MMA, Twin Rivers' desire for alternate rail service does not prove irreparable harm and is insufficient by itself to justify a grant of a preliminary injunction. The evidence at the preliminary injunction hearing shows

that, although less desirable than direct shipment by rail, the Edmundston transloading operation is feasible, and that any harm to Twin Rivers is calculable.

## C.    Balance of the Injuries and the Public Interest

The Court views the balance of harms and the public interest as very much in equipoise. The last few decades have been challenging to the once dominant paper industry in the state of Maine. Yet mills that have survived, like Twin Rivers, remain a vital part of the local and state economy. So too are the businesses, like MMA, that count the paper mills as among their most important customers. The public interest is served best by a return to the economic model of a vibrant profitable mill producing paper that is transported by rail by both MMA and Canadian National.

The Court takes most seriously Twin Rivers' contention that to remain competitive, it must have railroad service that is more accommodating and cost-efficient than what MMA has been willing or able to provide. The Court also takes most seriously MMA's contention that the jobs of its workers are at risk; MMA has already been forced to layoff thirty-one of its workers.

Despite the considerable gravitational forces pulling Twin Rivers and MMA together, the current parties for reasons of history, economics, and personality seem caught in powerful centrifugal forces. In view of this intractable state of affairs, the Court views positively Canadian National's interest in serving Twin Rivers and providing it with a level of service and price that will help sustain Twin Rivers' business.

But none of the parties' equitable positions trumps the others'. Ultimately, the public interest is best served by businesses that produce high quality and price competitive products, whether paper rolls or rail transportation, so that these business can offer secure and high paying jobs to the members of the public and assume their respective places as good corporate citizens of the region. As long as these overriding goals are being met, it matters little whether MMA or Canadian National is operating the train.

## II. CONCLUSION

The Court DENIES Canadian National Railway Company and Waterloo Railway Company's Emergency Motion for a Temporary Restraining Order and Related Relief and for Entry of Preliminary Injunction Pursuant to Rule 65, M.R.Civ. P. (Docket # 4), as joined by Twin Rivers Paper Company LLC (Docket # 6). The Court DENIES Montreal, Maine & Atlantic Railway, Ltd.'s Motion to Dismiss or Stay Litigation and Compel Arbitration (Docket # 51).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 1st day of April, 2011